Estate of Walter S. Rae v. Commissioner.
Estate of Rae v. Commissioner
Docket No. 108736.
United States Tax Court
1943 Tax Ct. Memo LEXIS 340; 1 T.C.M. (CCH) 988; T.C.M. (RIA) 43193; April 28, 1943
*340 R. J. Cleary, Esq., Farmers Bank Bldg., Pittsburgh, Pa., Lee W. Eckels, Esq., Pittsburgh, Pa., and A. L. Schneider, C.P.A., Pittsburgh, Pa., for the petitioner. J. Harrison Miller, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding is to redetermine income tax deficiencies determined by the respondent against petitioner's decedent in the sum of $26,818.37 for the year 1936 and the sum of $8,571.06 for the year 1937. The several questions presented are: (1) Whether the petitioner is entitled to a deduction for the year 1936 for the alleged abandonment by her decedent in that year of United States Letters Patent No. 1,953,091, known as the Westberg patent, under section 23 (e) of the Revenue Act of 1936. (2) Whether the petitioner is entitled to a deduction for the year 1936 for the alleged abandonment by her decedent of certain shotcrete guns manufactured under those Letters Patent, under the same statutory provision. (3) Whether the petitioner is entitled to deduct in the years 1936 and 1937 as salary of Walter S. Rae, Jr., any amounts in excess of the sum of $3,000 actually paid to him by her decedent in each of those respective *341 years. (4) Whether the allowance by the respondent of a deduction of $5,000 for each of the years 1936 and 1937, respectively, constitutes reasonable compensation for the services rendered by Walter S. Rae, Jr., and so is deductible for those years by the petitioner, under section 23 (a) of the Revenue Act of 1936. (5) Whether the transactions entered into the May 1937, whereby petitioner's decedent completely disposed of "claims, rights, titles and interests" in the Wellston No. 2 Company were (a) in effect a sale of the capital assets and the deductible loss thereon limited, under section 117 of the Revenue Act of 1936, as reported by decedent in his return for that year, or (b) do they support the deduction of a bad debt in the amount of the difference between the decedent's basis therefor and the amount received, or (c) whether, as alleged by respondent in his answer to the amended petition, petitioner is entitled to no deduction. The record consists of a stipulation of facts, oral testimony and documentary proof. All facts set forth in the stipulation not specifically found are incorporated by reference. Findings of Fact The petitioner is the executrix under the last will *342 and testament of Walter S. Rae, deceased. The returns for the years involved were filed with the collector of internal revenue for the Twenty-third District of Pennsylvania. Prior to 1936 and down to the time of his death on November 18, 1939, the petitioner's decedent was engaged in the general contracting business with his main office at Pittsburgh, Pennsylvania. On June 5, 1935, he acquired by purchase from Gustave H. Westberg, an undivided one-half interest in United States Letters Patent No. 1,953,091, issued April 3, 1934. A first re-issue was granted July 6, 1937. On June 6, 1939, United States Letters Patent No. 2,161,553 were issued covering "a means of conveying and mixing a comminuted material, and particularly pertains to a cement gun of the type generally indicated in a patent" issued under date of April 3, 1934, Patent No. 1,953,091. The consideration paid by the decedent for the one-half interest was $22,000, and in addition to said sum he expended in the acquisition and development the sum of $6,068.25. The decedent carried the aforesaid patents on his books as assets until his death and amortized them in the years 1936, 1937, 1938 and 1939. In his financial statements *343 filed with the Union Trust Company of Pittsburgh in 1936 and again in 1938, he showed the patents as costing $22,000 and their net cost after amortization prorated over their legal life of 17 years. The Federal Estate Tax return of the petitioner reported the value of the Westberg patents as "nothing". They were appraised at $100 for inheritance tax purposes by the Commonwealth of Pennsylvania. The petitioner executed two options to "Ed. Westberg, of Los Angeles, California" for the sale of said patents for the sum of $5,000. The first option was dated June 1, 1940, and the second, September 1, 1940. Neither of said options was exercised. The petitioner demanded and received from Ed. Westberg the sum of $100 in connection with the last option. This amount was taken into the estate as miscellaneous income. The decedent did not in 1936, or any time prior to death, intend to or abandon the Westberg patents as worthless. During the year 1935, decedent caused to be manufactured under the Westberg patent five cement guns at a cost of $5,083.72. These guns did not operate efficiently and decedent had them redesigned and rebuilt at a cost of $7,483.86. By entries under date of December *344 31, 1936, rebuilding costs to the extent of $5,353.09 were capitalized on decedent's books as "Plant and Equipment". In March 1937, one of the rebuilt Westberg guns was sold to the Utah Construction Company for the sum of $2,000. Another gun was shipped in 1937 to Concrete, Ltd., Australia, for demonstration, but no sale was effected and the gun was returned without cost to the decedent. The decedent owned the four Westberg concrete guns at his death, and at that time they were carried on his books of account at a net book value of $2,498.13. Neither the original nor the redesigned Westberg cement guns performed to decedent's complete satisfaction. There were many difficulties encountered in their operation, partly due to their use in work they were not best fitted to do, and in part due to the lack of skill of the operator. The Westberg cement guns cost considerably more to manufacture than the Allentown guns, which were then being generally used and on which the patents had expired. The petitioner's decedent was not successful in establishing a market for the Westberg cement guns and those he manufactured were used principally in his own personal construction business. The *345 decedent's income tax returns for each of the years 1936 and 1937 were filed on a cash receipts and disbursements basis. Walter S. Rae, Jr., decedent's son, was employed in his father's business continuously from 1930 until the death of the latter in November 1939. He was actually paid the sum of $3,000 in 1936 and 1937 respectively. On December 31, 1936, an amount of $22,499.20 was debited to profit and loss and credited to an account captioned "Walter S. Rae, Jr. - Loan #81", an account payable on decedent's books. In 1937 in addition to the $3,000 actually paid to Walter S. Rae, Jr., a further sum of $21,865.69 was charged on December 31, 1937 to profit and loss and credited to an account captioned "Walter S. Rae, Jr. - Loan #81", an account payable on decedent's books. Under date of January 15, 1936, the decedent wrote to his son, Walter S. Rae, Jr., as follows: Mr. Walter S. Rae, Jr., Koppers Building, Pittsburgh, Pa.
Dear Sir: - Re: Your request for additional compensation which you believe is due you in that you have taken over and successfully carried on the duties taken care of by my late brother in addition to your own work and are now acting as General Superintendent *346 of all construction work. With conditions as uncertain as they are, I do not wish to increase the fixed overhead by raising your salary but effective as of the first of this year there will be added to your yearly salary as a bonus, forty-five (45%) percent of the net earnings of the construction business. This new agreement cancels all previous agreements and is to continue in force as long as you continue in your present employment. Yours very truly, (Signed) Walter S. Rae Accepted (sgd) Walter S. Rae, Jr. Walter S. Rae, Jr., was a graduate civil engineer. In the early part of his employment with decedent he acted as a field superintendent. In about 1935 he was given responsibility in the office of decedent where he continued to serve the latter's interest. In 1936 and 1937, while the greater part of his time was spent in the office, he traveled to various work under construction and to prospective jobs on which decedent desired to submit a bid. On December 2, 1936, decedent suffered a heart attack and was away from his business for several months. His son, Walter, who resided with his father, thereafter assumed the responsibilities of running the company's affairs, generally *347 consulting with and following the instructions given by his father. In the decedent's business he also employed Ambrose R. West, a registered engineer, whose principal duty was that of an estimator. The decedent and his son also worked on estimates, but the final bid was made up and submitted by the decedent or by the son under decedent's instructions. West was paid a salary of $250 a month in 1936 and to September 1937, when it was increased to $275 per month. Decedent also employed another engineer by the name of Howard Nestlerode, whose duty was superintending work in the field. The salary paid Nestlerode was $85 per week. Walter S. Rae, Jr., during the absence of his father, had responsibility over and gave directions to both West and Nestlerode. The full amounts deducted as salary of Walter S. Rae, Jr., and credited to the "Walter S. Rae, Jr. Loan # 81" account at the end of the respective years 1936 and 1937 were not drawn in those years by Walter S. Rae, Jr. The reasonable value of the services performed by Walter S. Rae, Jr., in the decedent's business during the year 1936 was $7,500 and for the year 1937 the sum of $10,000. The decedent was a large stockholder of the *348 Wellston No. 2 Company, an Ohio corporation, engaged in mining coal by the stripping process. During the period from October 28, 1933 to March 1, 1937, decedent advanced to or on behalf of the Wellston No. 2 Company various amounts aggregating $90,564.10, against which he received payments of $64,329.14. Under dates of April 12, 1934, May 7, 1934 and May 22, 1934, respectively, the Wellston No. 2 Company executed and delivered to Walter S. Rae three demand notes, each for $15,000, in which notes he was the designated payee. The April 12, 1934 and the May 22, 1934 notes for $15,000 at one time bore endorsements "Pay to the order of Beryl S. Stiening", but were never delivered to her. In 1937, under instructions of the decedent, these endorsements were blanked out. These two notes were not at any time carried on the books of decedent as an asset. In 1937 the decedent, in recognition of his obligation to his daughter, and to discharge the same, paid to her in cash $20,000 and executed and delivered to her two notes, for $10,000 and $2,000, respectively. On February 20, 1937, Walter S. Rae, Jr., son of decedent, as president of Wellston No. 2 Company, filed a voluntary petition in *349 bankruptcy in the United States District Court, Southern District of Ohio, Eastern Division, alleging the insolvency of said company; and on said day it was adjudged a bankrupt. On February 20, 1937, certain other creditors of the Wellston No. 2 Company filed a petition with said court, praying for relief under section 77B of the Bankruptcy Act. On February 27, 1937, the Wellston No. 2 Company, by its president, Walter S. Rae, Jr., answered the petition alleging, inter alia, that for financial and other reasons the company was unable to submit a plan; the petitioning creditors had no plan; they had not filed their petition in good faith; and prayed for a dismissal. On March 9, 1937, the court entered an order approving the petition as properly filed under section 77B and consolidated the two proceedings. On May 27, 1937, the decedent, by his attorney in fact, filed Proof of Priority Debt and also Proof of Unsecured Debt. On May 27, 1937, the Wellston No. 2 Company, by its president, Walter S. Rae, Jr., filed in said proceeding a plan of reorganization which provided among other things material here as follows: (A) Roy J. Gillen of Wellston, Ohio, is to purchase and deliver *350 to the Debtor Corporation all evidences of indebtedness and full releases from Walter S. Rae and Walter S. Rae, Jr., amounting to $38,995.68 and to pay to the Debtor Corporation in addition thereto, the sum of $2,000.00. In consideration whereof, the Debtor Corporation will execute and deliver to the said Roy J. Gillen a note secured by chattel mortgage upon the two items of equipment known as the Marion Dragline Type 125, Shop No. 5657, and the Marion Steam Shovel, Type 37, Shop No. 5843, in the sum of $15,000.00 with interest at 6% per annum and due on or before April 1st, 1938. Said chattel mortgage to be the first and best lien against the two items of property hereinbefore named. On motion for the confirmation of the plan an order, dated May 27, 1937, was entered which contained the following provision: (q) All claims of Walter S. Rae and Walter S. Rae, Jr. against said Debtor, which claims have heretofore been purchased by Roy J. Gillen, are hereby cancelled and extinguished in accordance with the provisions of said plan. By written agreement under date of May 27, 1937, the decedent agreed to "sell, assign, transfer and deliver" to Roy J. Gillen all his "right, title and *351 interest" in certain claims against Wellston No. 2 Company. Roy J. Gillen agreed "to accept the right, title and interest" of the decedent in those claims and further agreed "to assume the obligations" of petitioner's decedent incurred in executing the indemnitor agreements on two Seaboard Surety Company bonds Nos. 74104 and 74105. The actual consideration paid by Roy J. Gillen was $8,000 out of which the decedent paid his attorneys $400 and expenses of $1.75. As a part of said transaction, the decedent executed a document called a "Release" which provided as follows: RELEASE FOR VALUE RECEIVED, I hereby sell, assign, and set over unto Roy J. Gillen all my right, title and interest in certain stock held by me in the Wellston No. 2 Company, Wellston, Ohio, thereby relinquishing my right, title and interest in said stock and any and all claims which I might have had therein. IN WITNESS WHEREOF I have hereunto set my hand and seal this 26th day of May, 1937. WITNESS (Sgd) Ambrose R. West (Sgd) B. J. Watson (Sgd) Walter S. Rae (Sgd) Walter S. Rae, Jr. Atty. in fact. The rights, title and interests Roy J. Gillen acquired from the decedent he turned over to the Wellston No. 2 Company *352 along with $2,000 in cash, for which he received that company's mortgage note for $15,000. At the same time, in conjunction with Roy J. Gillen, O. C. Wells advanced to the Wellston No. 2 Company the sum of $8,000 and received a mortgage note from said company for $10,000. Upon the fulfillment of the agreement between Roy J. Gillen and the decedent, the later ceased to have any interest in the Wellston No. 2 Company. Prior to the agreement between the decedent and Roy J. Gillen, the later had no interest in the Wellston No. 2 Company, either as stockholder or creditor. There was no liquidation of the Wellston No. 2 Company in 1937; no distribution of assets; no new stock was issued; no new corporation was formed; but with the financial aid give it by Roy J. Gillen and O. C. Wells, it continued operations as theretofore. Opinion The petitioner is the executrix of the estate of Walter S. Rae, who at the time of his death on November 18, 1939 was a resident of the City of Pittsburgh, Pennsylvania. For many years prior to and at the time of his death he was engaged in the contract construction business as an individual. The first issue is whether the decedent in 1936 abandoned his *353 one-half interest in certain Letters Patent issued April 3, 1934, by the United States, No. 1,953,091, hereafter referred to as the Westberg patent. The sections of the Revenue Act of 1936 and Regulations 94 applicable to this and the next issue are set forth in the marginal notes. [1]
*354 On June 6, 1935, the decedent acquired by assignment from Gustave H. Westberg a one-half interest in the aforesaid Letters Patent, at a cost to decedent of $22,000. Concurrently, the two parties executed an agreement containing covenants and restrictions governing the use and exploitation of this patent which are not material here. In the course of the decedent's negotiation of the purchase, his patent attorney advised that the claims were not sufficiently broad and an application for the allowance of additional claims was filed and a reissue was granted July 6, 1937; on June 6, 1939, new Letters Patent were granted, No. 2,161,553, pertaining "to a cement gun of the type generally indicated in a patent" No. 1,953,091. The claims and specifications for this new patent were filed on September 30, 1935. The decedent, after acquiring his interest in the original Westberg patent, caused to be manufactured under the drawings and specifications five cement guns. These did not operate satisfactorily and the decedent had them redesigned and manufactured by another concern. The decedent believed that the cement guns manufactured under the Westberg patent, although costing more to manufacture, *355 would prove superior to the Allentown gun, a cement gun then generally used in the construction business. Some of these five guns he used in his own business during the year 1936. He also caused to be prepared a prospectus, which was issued in November 1936, whereby he hoped to exploit their sale in the territory assigned to him under the aforementioned agreement with Westberg. The Westberg guns did not perform up to decedent's expectations, and during 1936 both he and his staff made many experiments in an attempt to correct the faults encountered in their use. Toward the end of 1936, the decedent stated in substance that he was "through" with the Westberg guns; that he was "kicking them out", and that he was "fed up" with them. These expressions, while indicative of disappointment, do not convincingly establish a final determination to abandon absolutely his rights to a legal monopoly under the Letters Patent as worthless. In contrast to decedent's utterances, the record establishes affirmative acts that logically justify a conclusion that there was no intent within the purview of the governing Revenue Act and Regulations to irrevocably effect an abandonment of the patent rights *356 in the year 1936. Throughout the period 1936 and until his death in 1939, the interest in the Westberg patent was carried as an asset on decedent's books and records; on financial statements filed for credit purposes as of December 31, 1936, June 30, 1938 and October 31, 1938, decedent listed his interest in the Westberg patent as an asset; on decedent's original and amended income tax returns filed in 1936, the original and amended return for 1937, as well as for 1938, deductions were claimed for amortization of the Westberg patents on a basis of their legal life; there was also a sale of one of the Westberg guns to the Utah Construction Company in March 1937 for $2,000. While these facts are not determinative of the issue of abandonment in 1936, they are forceful here in educing the logical inferences to be drawn from all the testimony. Especially is this true where, as here, the evidence of the surviving members of the family is quite contradictory, and death has sealed the lips of the decedent, who best could make any explanation of his intents and purposes. We are not convinced the petitioner has sustained the burden that there was an absolute abandonment in 1936 of the decedent's *357 undivided interest in the Westberg patent. On this issue we sustain the respondent. While the determination of the first issue does not necessarily require a similar holding with respect to the second issue, to wit, whether the cement guns manufactured under the patent were completely abandoned in the year 1936, nevertheless, under all the facts, we sustain the respondent on the second issue as to the actual abandonment of the Westberg guns as worthless in the year 1936. The third issue involves the question whether petitioner is entitled to deductions in the years 1936 and 1937 as salary of any amounts in excess of the $3,000 actually paid in each of those years for services performed by Walter S. Rae, Jr., in the decedent's business. The facts are not entirely identical for each of the respective years. The decedent's son, Walter S. Rae, Jr., was a graduate civil engineer and was employed in various capacities in the decedent's business continuously from 1930 to decedent's death in 1939. In January 1936 decedent addressed a letter to his son stating, in substance, that effective as of the first of that year "there will be added to your yearly salary as a bonus, forty-five (45%) *358 percent of the net earnings of the construction business". The yearly salary paid during the years in question was $250 per month. The law is firmly established that the taxpayer carrying on a trade or business is entitled to deduct from gross income a "reasonable allowance for salaries or other compensation for personal services actually rendered". (Revenue Act of 1936, section 23(a)). Botany Worsted Mills v. United States, 278 U.S. 282, 73 L. Ed. 379, 49 S. Ct. 129. The question here is whether the agreement of January 15, 1936, provided for a reasonable compensation so as to constitute an ordinary and necessary expense. (Revenue Act of 1936, section 23 (a)). [2] Regulations 94, art. 23(a)-6; art. 23(a)-8. [3]
*359 There is no fixed standard by which the reasonableness of the compensation can be measured. Each case must stand on its own particular facts. The amount paid by similar enterprises for services of like character furnishes a guide but not a rule. William S. Gray & Co. v. United States, 68 Ct. Cl. 480, 35 F.2d 968. The business of the petitioner's decedent was solely owned and operated. The record discloses the natural ambition of a father that upon his retirement his son would succeed him and continue the business. To this end he so arranged it that the son would acquire experience in all the phases of the business; over the years the decedent gradually increased the responsibilities intrusted to his son. The knowledge and experience the son acquired through this process of development increased the value of his services to the business. In the early period of his employment the son supervised the construction work in the field. About 1935 he was transferred to the office and given new responsibilities there. During the period of 1936, while he traveled to various jobs under construction, he worked in close cooperation with his father in the supervision and *360 general operation of the office. In December 1936, the decedent suffered a heart attack and was confined to his home. For a period of several months thereafter decedent did not go to his office but, in collaboration with his son, directed the most vital activities of the business. As a consequence of decedent's physical condition and his prolonged absence from the office, the son was required to assume greater responsibilities and authority in the running of the business. Furthermore, in 1937 the contract construction business improved, activities increased, and the burden of responsibility placed upon the son became more onerous. For these reasons we hold that a distinction must be made as to what constitutes reasonable compensation for the services rendered in the respective years 1936 and 1937. In substantiation of petitioner's claim that the agreement of January 15, 1936 provided for only a reasonable compensation for the services to be rendered by Walter S. Rae, Jr., expert testimony was offered by five executives in competitive lines of the construction work. In response to a hypothetical question propounded to each, they all expressed the opinion that compensation called for *361 by the agreement was reasonable under the assumed facts. Opinion evidence, while often helpful, is not binding on the trier of the fact. The respondent did not call any expert witness on his behalf, but through the cross-examination of petitioner's experts placed on the record a quite complete survey of the salaries and compensations paid by the decedent's competitors for services similar in character. Such testimony, likewise, is not binding upon us, but constitutes an element to be taken into consideration on the question presented for our determination. The evidence shows that the salaries paid by other concerns engaged in construction work ranged from $300 to as high as $1,000 per month. It also demonstrated that invariably salaries were higher in 1937 than in 1936, due somewhat to improved conditions in that line of enterprise. The respondent, under an affirmative issue, urges that the deduction to be allowed must be limited to the basic salary of $250 per month actually paid to Walter S. Rae, Jr., in the respective years under review. Several authorities are cited, which would control our decision if the facts upon which they were determined were analogous. We do not regard *362 them as decisive here. The evidence establishes that the amounts claimed as a deduction for the salary of Walter S. Rae, Jr., for services rendered in 1936 and 1937 were not paid in those respective years; nevertheless, the manner in which they were entered on the-decedent's records leaves no doubt in our minds that what actually was done constitutes the equivalent of payment so as to permit their deduction, if found reasonable. The decedent filed information returns, showing their payment; the amounts credited were shown as liabilities on his statements to the bank for credit purposes; and later the obligation was completely discharged to the satisfaction of the obligee. Furthermore, Walter S. Rae, Jr., made his income tax returns and paid the tax on the basis of their receipt. Undoubtedly, the contract of January 15, 1936 was valid and enforceable. The validity or invalidity of the contract, while of no materiality on the question of reasonableness, is of importance in the consideration of this particular question. We will not ascribe to a deceased taxpayer a motive or intent to evade his legal tax liability where the documentary proof justifies a conclusion that the purpose was *363 lawful, and so do not give full credence to some of the oral testimony on the question of intent. We therefore hold that the respondent has not sustained the burden on this affirmative issue, raised by amendment to his answer, that the allowance must be limited to the amount actually paid. The respondent contends that if the court holds adversely to his position that the deduction allowed must be limited to the $250 per month actually paid in the years 1936 and 1937, then the sum of $5,000 allowed on the audit of the return should be held to be the reasonable allowance here. We are not convinced that the petitioner has established that the amounts claimed as a deduction as salary paid or credited in the years 1936 and 1937 were a reasonable compensation for the services actually rendered. We are likewise not convinced that the $5,000 allowed by the respondent is the reasonable value of such services. Viewing the matter in the light of the facts and all the circumstances presented in the entire record, we have found that the reasonable compensation for the services of Walter S. Rae, Jr., actually rendered in the decedent's business for the year 1936 was $7,500 and $10,000 for the *364 year 1937. Petitioner is entitled to those deductions. The final issue involves the determination of the nature and tax consequences of a certain transaction occurring in 1937 in which the interests of the decedent in and claims against the Wellston No. 2 Company were disposed of to one Roy Gillen. In his return for 1937 decedent treated this transaction as the disposition of capital assets in so far as two of his notes of the Wellston No. 2 Company were concerned. He reported a capital loss of $16,861.90 thereon and claimed and was allowed a deduction of $2,000 under section 117 of the Revenue Act of 1936. By amendment to the petition it is now asserted that this was not a capital transaction but that all of decedent's claims against the Wellston No. 2 Company were there and then satisfied in connection with the reorganization of that company by receipt of less than decedent's basis for those claims so that the difference is deductible as an ordinary loss. Replying to that allegation, respondent not only denies it but affirmatively pleads that petitioner is not entitled to any capital loss because the Wellston No. 2 Company notes upon the sale of which to Gillen such a loss partially *365 depends, belongs to decedent's daughter when sold and, secondly, petitioner has no basis for one of these notes. The parties are at considerable variance as to what the record and the decedent's books of accounts show with respect to his dealings with the Wellston No. 2 Company. The books and records of that company were not available to the petitioner. We have found, however, the fact that decedent had made advances to or on behalf of that company before March 1937 in amounts aggregating $90,564.10 against which there were credits in the sum of $64,329.14, leaving decedent a balance owing as of that date of $26,234.96. Decedent possessed at that time three demand notes of the Wellston No. 2 Company in the face amount of $15,000 each and dated April 12, May 7 and May 22, 1934, respectively. The decedent was the designated payee in all three notes. The two notes of May 7, 1934 and May 22, 1934, upon which decedent reported a capital loss, had at some unidentified time been endorsed over to his daughter, petitioner here. These endorsements were blanked out on the instructions of the decedent and the notes were not delivered to her. In 1937 the decedent, in recognition of obligations *366 to his daughter and in discharge of the same, paid to her in cash $20,000 and executed and delivered to her two notes for $10,000 and $2,000, respectively. On this record we find that respondent has failed to sustain his burden of establishing either that the Wellston No. 2 Company notes involved in the transaction with Gillen in 1937 did not then belong to the decedent or that the basis of the petitioner for them was not that used in computing the capital loss reported in his return for that year. The decedent was the owner of at least 237 out of 500 authorized shares of the capital stock of the Wellston No. 2 Company of the par value of $100 per share. [4] On February 20, 1937, Walter S. Rae, Jr., son of the decedent, as president of the Wellston No. 2 Company, filed a voluntary petition to have that company adjudged a bankrupt. Dissident creditors, in an endeavor to have the company continue as a going concern, moved the court for leave to file a petition under section 77B of the Bankruptcy Act. Leave was granted and the two proceedings were consolidated. Later a plan was submitted to the court which was approved and carried out under the court's direction. *367 Involved in that plan was an agreement whereby Roy J. Gillen was to acquire from the decedent for an expressed consideration of $8,000, all of the latter's right, title and interest in claims against the Wellston No. 2 Company. As further consideration Gillen was to assume all obligations of the decedent as indemniter on two Seaboard Surety Company bonds then outstanding. This agreement was consummated and thereafter decedent ceased to have any further interest whatsoever in the company. Upon acquiring the interest of the decedent in the Wellston No. 2 Company, Gillen transferred them to that corporation together with an additional $2,000 in cash and thereupon received that company's mortgage note for $15,000. At the same time, O. C. Wells advanced $8,000 to the Wellston No. 2 Company and likewise took its mortgage note. The cash received from these two sources was used to acquire the interests of other creditors unwilling to go along with the plan. Prior to the transaction above referred to, Gillen had no interest whatsoever in the Wellston No. 2 Company. No new corporation was formed. There was no liquidation or bankrupt sale. The company, relieved from the pressing demands of *368 certain of its creditors, continued its mining operations as theretofore. There was no reorganization nor did the plan contemplate one. The manner in which the decedent chose to handle his interests concerning the mining company, so long as lawful, was his sole prerogative. We have only to interpret the effect of what was done. Weiss v. Wiener, 279 U.S. 333, 73 L. Ed. 720, 49 S. Ct. 337. We do not agree with the petitioner's argument that Gillen was the alter ego of the mining company, or a mere agent or conduit to acquire the decedent's interests so that the transaction was merely the compromising of an indebtedness of the corporation. Gillen was an independent actor acquiring the decedent's interest on his own behalf. By retransfer of the claims he had acquired from the decedent, plus additional cash, he became a preferred creditor of the corporation. The acquisition by Gillen of the decedent's interests did not wipe out the corporation's indebtedness. By a separate and distinct transaction between Gillen and the corporation with which the decedent was not concerned, the corporation substituted a new secured obligation in lieu of the unsecured one owned by the decedent. True, *369 Gillen would not become finally bound by his agreement with the decedent until the sanction of the bankruptcy court was assured, but that was because of his sagacity. It does not affect the character of the transaction so far as decedent is concerned. We hold on this issue that the transaction whereby the decedent disposed of all his interests in and claims against the Wellston No. 2 Company was in fact a sale of capital assets and section 117 of the Revenue Act of 1936 is controlling. Summing up, we affirm respondent's determination in all respects except his disallowance of deductions for salaries in 1936 and 1937 to decedent's son, Walter S. Rae, Jr. Decision will be entered under Rule 50.
Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * * * *
(e) LOSSES BY INDIVIDUALS. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or (3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. * * * REGULATIONS 94. Art. 23(e)-3. Loss of Useful Value. - ↩ When, through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted as provided in section 113 (b) and articles 113(a)(14)-1, 113(b)(1) and 113(b)(2) and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded, as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible * * *.
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *. ↩
3. Art. 23(a)-6. Compensation for Personal Services. - Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. This test and its practical application may be further stated and illustrated as follows: (1) Any amount paid in the form of compensation, but not in fact, as the purchase price of services is not deductible. * * * (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. Art. 23(a)-8. Bonuses to Employees. - Bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered. It is immaterial whether such bonuses are paid in cash or in kind or partly in cash and partly in kind. Donations made to employees and others, which do not have in them the element of compensation or are in excess of reasonable compensation for services, are not deductible from gross income.↩
4. The issue involving an alleged loss of decedent on this stock has been conceded by petitioner because of inability to secure proof to support the assignment of error.↩