## BOTANY WORSTED MILLS *v.* UNITED STATES.

No. 31. Submitted April 23, 1928. Argued November 20, 1928.— Decided January 2, 1929.

Mr. *Nathan A. Smyth* for petitioner.

*Solicitor General Mitchell* for the United States.

284

Mr. Justice Sanford delivered the opinion of the Court.

The Botany Worsted Mills, a New Jersey corporation engaged in the manufacture of woolen and worsted fabrics, made a return of its net income for the taxable year 1917 under the Revenue Act of 1916 [1] and the War Revenue Act of 1917.[2] By § 12(a) of the Revenue Act it was provided that in ascertaining the net income of a corporation organized in the United States there should be deducted from its gross income all " the ordinary and necessary expenses paid within the year in the maintenance and operation of its business and properties." Under this provision the Mills deducted amounts aggregating $1,565,-739.39 paid as compensation to the members of its board of directors, in addition to salaries of $9,000 each. It paid an income tax computed in accordance with this return. Thereafter, in 1920, the Commissioner of Internal Revenue assessed an additional income tax against it. Of this, $450,994.06 was attributable to his disallowance of $783,656.06 of the deduction claimed as compensation paid to the directors, on the ground that the total amount paid as compensation was unreasonable and the remainder of the deduction as allowed represented fair and reasonable compensation. The Mills, after paying the additional tax, filed a claim for refund of this $450,994.06. The claim was disallowed; and the Mills thereafter, in September 1924, by a petition in the Court of Claims sought to recover this sum from the United States, with

---

[1] 39 Stat. 756, c. 463.    [2] 40 Stat. 300, c. 63.

interest—alleging that the disallowance of part of the compensation paid the directors was illegal.[3]  After a hearing on the merits the court, upon its findings of fact, dismissed the petition upon the ground that the additional tax was imposed under an agreement of settlement which prevented a recovery.  63 C. Cls. 405.  And this writ of certiorari was granted.

The first question presented is whether the Mills is precluded from recovering the amount claimed by reason of a settlement.

Sec. 3229 of the Revised Statutes,[4] provides that: " The Commissioner of Internal Revenue, with the advice and consent of the Secretary of the Treasury, may compromise any civil or criminal case arising under the internal-revenue laws instead of commencing suit thereon; and, with the advice and consent of the said Secretary and the recommendation of the Attorney-General, he may compromise any such case after a suit thereon has been commenced.  Whenever a compromise is made in any case there shall be placed on file in the office of the Commissioner the opinion of the Solicitor of Internal Revenue, . . . with his reasons therefor, with a statement of

---

[3] Sec. 3226 of the Revised Statutes had been previously amended by § 1318 of the Revenue Act of 1921, 42 Stat. 227, 314, c. 136, so as to provide that no suit or proceeding should be maintained in any court for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected until a claim for refund or credit had been duly filed with the Commissioner of Internal Revenue; and further amended by § 1014(a) of the Revenue Act of 1924, 43 Stat. 253, 343, c. 234, so as to provide that such suit or proceeding might be maintained, whether or not such tax had been paid under protest or duress.  And the right of the Mills to maintain this suit, although the tax had not been paid under protest or duress, is not questioned by the Government.

[4] U. S. C., Tit. 26, § 158.

the amount of tax assessed, . . . and the amount actually paid in accordance with the terms of the compromise." [5]

The Government did not claim that there had been a compromise under this statute, but contended in the Court of Claims that, irrespective thereof, an agreement of settlement had been entered into between the Mills and the Commisioner under which the Mills had accepted the partial disallowance as to the compensation paid the directors, and had also received concessions as to other disputed items the benefit of which it still enjoyed, and was therefore estopped from seeking a recovery.

As to this matter the findings of fact show that after the Mills had paid the amount of the tax shown by its original return, an investigation of its books disclosed to the Commissioner the necessity of making an additional assessment, to be determined by the settlement of questions relating to the compensation (or, as it was termed, bonus) paid to the directors, depreciation charged off on its books, and reserves charged to expenses. After much correspondence and numerous conferences extending over several months between the attorney and assistant treasurer of the Mills and the chief of the special audit section of the Bureau of Internal Revenue and others of his official associates, a compromise was agreed to as to all the differences, by which the amounts to be allowed as reasonable compensation to the directors and as depreciation were agreed upon, and the claim as to reserve was allowed. Thereupon the Mills prepared and filed an amended return based upon the figures agreed upon in the conferences, with documentary evidence which it had

[5] Since the date of the settlement here involved §§ 1312 and 1313 of the Revenue Act of 1921, § 1006 of the Revenue Act of 1924, and § 1106(b) of the Revenue Act of 1926 have dealt specifically with agreements in writing made by a taxpayer and the Commissioner, with the approval of the Secretary, that the previous determination and assessment of a tax shall be final and conclusive.

agreed to furnish; and the additional assessment was made in accordance with this return.[6]

The court, in sustaining the Government's contention, said: " With the payment of the tax under the circumstances surrounding this case the agreement, which is mentioned in the record as a ' gentleman's agreement,' became in legal effect an executed contract of settlement "; and that, as the Mills was seeking to recover on account of the particular item which it regarded as unfavorable to its interests, and at the same time hold to the advantage derived from the settlement of other items in dispute involved in the same general settlement, it should not be allowed a recovery.

. The Mills contends that the Commissioner had not been given, at the time in question, any authority, either in express terms or by implication, to compromise tax cases except as provided in § 3229; that this statute in granting such authority under specific limitations as to the method to be pursued, negatived his authority to effect a valid and binding agreement in any other way; that as the Government could not have been estopped by the unauthorized transactions of its officials, the Mills likewise could not be estopped thereby; and further, that the findings are insufficient to establish an estoppel.

The Government does not here challenge any of these contentions. In the brief for the United States filed in this Court the Solicitor General states that the question whether such an informal adjustment of taxes as was made in this case is binding on the taxpayer, is submitted for decision in deference to the opinion of the Court of Claims and the importance of the question—but no argument is made in support of the Government's previous contention that the Mills was estopped from questioning

---

[6] The findings indicate inferentially that some tax claims of the Mills for two other years were also included in the settlement; but the precise facts do not appear.

the settlement. And, on the contrary, it is stated that— "Before and since the date of the alleged settlement in this case Congress has evidently proceeded on the theory that no adjustment of a tax controversy between representatives of the Bureau of Internal Revenue and a taxpayer is binding unless made with the formalities and with the approval of the officials prescribed by statute. The authority of officers of the United States to compromise claims on behalf of or against the United States is strictly limited. . . The statutes which authorize conclusive agreements and settlements to be made in particular ways and with the approval of designated officers raise the inference that adjustments or settlements made in other ways are not binding." And further, that " No ground for the United States to claim estoppel is disclosed in the findings."

Independently of these concessions, we are of the opinion that the informal settlement made in this case did not constitute a binding agreement. Sec. 3229 authorizes the Commissioner of Internal Revenue to compromise tax claims before suit, with the advice and consent of the Secretary of the Treasury, and requires that an opinion of the Solicitor of Internal Revenue setting forth the compromise be filed in the Commissioner's office. Here the attempted settlement was made by subordinate officials in the Bureau of Internal Revenue. And although it may have been ratified by the Commissioner in making the additional assessment based thereon, it does not appear that it was assented to by the Secretary, or that the opinion of the Solicitor was filed in the Commissioner's office.

We think that Congress intended by the statute to prescribe the exclusive method by which tax cases could be compromised, requiring therefor the concurrence of the Commissioner and the Secretary, and prescribing the formality with which, as a matter of public concern, it should be attested in the files of the Commissioner's office;

and did not intend to intrust the final settlement of such matters to the informal action of subordinate officials in the Bureau. When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode. *Raleigh, etc. R. R. Co.* v. *Reid,* 13 Wall. 269, 270; *Scott* v. *Ford,* 52 Ore. 288, 296.

It is plain that no compromise is authorized by this statute which is not assented to by the Secretary of the Treasury. *Leach* v. *Nichols* (C. C. A.) 23 F. (2d) 275, 277. For this reason, if for no other, the informal agreement made in this case did not constitute a settlement which in itself was binding upon the Government or the Mills. And, without determining whether such an agreement, though not binding in itself, may when executed become, under some circumstances, binding on the parties by estoppel, it suffices to say that here the findings disclose no adequate ground for any claim of estoppel by the United States.

We therefore conclude that the Mills was not precluded by the settlement from recovering any portion of the tax to which it may otherwise have been entitled.

This brings us to the question whether on the findings of fact the Mills is entitled to recover the portion of the additional tax attributable to the disallowance of $783,-656.06 of the amount paid to the directors which it had claimed as a deduction.[7]

Under § 12 (a) of the Revenue Act of 1916 the Mills was not entitled to this deduction unless the amount paid constituted a part of its "ordinary and necessary expenses" in the maintenance and operation of its business and properties. And in this suit the burden of establish-

[7] This is claimed in the brief filed for the Mills; and in the oral argument its counsel specifically stated that the Mills relied on the sufficiency of the findings and made no request that the case be remanded to the Court of Claims for additional findings, as the Solicitor General had suggested.

ing that fact rested upon it, in order to show that it was entitled to the deduction which the Commissioner had disallowed, and that the additional tax was to that extent illegálly assessed. The Court of Claims, however, made no finding that the amount disallowed by the Commissioner constituted a part of the ordinary and necessary expenses of the Mills. The findings are silent as to this ultimate fact—essential to a recovery by the Mills—and only show certain circumstantial facts relating to the payment made to the board of directors.

Where the Court of Claims does not make a finding upon the ultimate question of fact upon which the rights of the parties depend, but merely makes findings as to subsidiary circumstantial facts which bear upon it, such findings will not support a judgment unless the circumstantial facts as found are such that the ultimate fact follows from them as a necessary inference and may be held to result as a conclusion of law. See *United States* v. *Pugh,* 99 U. S. 265, 269; *Winton* v. *Amos,* 255 U. S. 373, 395.

The findings show that for many years it has been the practice of many corporations engaged in the woolen manufacturing business to base the compensation of the directors and executive officers upon a percentage of profits. Upon the organization of the Mills in 1890 the stockholders adopted a by-law providing that at the close of the business year the net profits should be distributed by paying a dividend of 6 per cent to stockholders and applying the balance remaining as follows: (a) placing 5 per cent in a reserve fund; (b) paying 25 per cent " as a bonus to the board of directors ";.and (c) paying 70 per cent as additional dividend to the stockholders. The stockholders amended this by-law in 1903 by increasing the bonus of the board of directors to 40 per cent; in 1905, by providing, instead of a " bonus," that " compensation "

equal to 40 per cent should be "paid to the board of directors for their services"; and in 1908, by reducing such compensation to 32 per cent [that is, 30.08 per cent of the net profits.] This by-law remained in force until after the taxable year 1917; and during the entire period "compensation" was paid to the directors in accordance therewith. From the outset the determination of the total amount of profits and of the aggregate amount payable to the board of directors was made by the board itself; and it likewise determined the basis of the apportionment among the several directors of the aggregate amount payable to the board as a whole. No contract was made with any director as to what his compensation should be other than such as was implied from his election and service as a member of the board in accordance with the by-law and the customary practices of the company, which each knew. At all times each director also held a position as an executive officer or manager of a department of the Mills.

The gross assets of the Mills increased from $1,114,-149.63 in 1890 to $28,893,777.12 in 1917; and its net assets, including reserves, from $37,136.35 to $10,999,862.48. Its net income increased from $784,334.44 in 1910 to $7,953,-512.80 in 1917; and the amount paid the directors in pursuance of the by-law increased, with some fluctuations, from $268,444.19 in 1910, to $400,935.18 in 1915, $693,-617.16 in 1916, and $1,565,739.39 in 1917.[8] In 1917 there were ten members of the board, so that if the total amount had been apportioned ratably, each would have received $156,573.93. And in that year each member of the board, in addition to the part of the aggregate in fact apportioned to him individually, also received a salary of $9,000.

---

[8] The figures for some other years are also given in tabulated statements included in the findings.

The findings do not show the nature or extent of the services rendered by the board of directors or its individual members, either as directors, executive officers or department managers—the amounts apportioned and paid to each director—the basis of apportionment, whether the nature and extent of their individual services, the amount of their stockholdings, or otherwise—the value of their services—or the reasonableness of the purported compensation.

We do not find it necesary to determine here whether the amounts paid by a corporation to its officers as compensation for their services cannot be allowed as " ordinary and necessary expenses " within the meaning of § 12 (a), merely because, and to the extent that, as compensation, they are unreasonable in amount.[9] However this may be, it is clear that extraordinary, unusual and extravagant amounts paid by a corporation to its officers in the guise and form of compensation for their services, but having no substantial relation to the measure of their services and being utterly disproportioned to their value, are not in reality payment for services, and cannot be regarded as " ordinary and necessary expenses " within the meaning of the section; and that such amounts do not become part of the " ordinary and necessary expenses " merely because the payments are made in accordance with an agreement between the corporation and its officers. Even if binding upon the parties, such an agreement does not change the character of the purported compensation or constitute it, as against the Government, an ordinary and necessary expense. Compare 20 Treas. Dec., Int. Rev., 330; *Jacobs & Davies* v. *Anderson* (C. C. A.), 228 Fed. 505, 506;

---

[9] Later, by § 214(a) of the Revenue Act of 1918, 40 Stat. 1057, c. 18, it was specifically provided that the " ordinary and necessary expenses " should include " a reasonable allowance for salaries or other compensation for personal services actually rendered."

*United States* v. *Philadelphia Knitting Mills Co.* (C. C. A.), 273 Fed. 657, 658; and *Becker Bros.* v. *United States* (C. C. A.), 7 F. (2d) 3, 6.

In the light of this principle it is clear that the findings do not show, as a matter of necessary inference resulting as a conclusion of law, that the amount paid the directors in excess of the $782,083.33 allowed by the Commissioner,[10] constituted part of the ordinary and necessary expenses of the Mills. On the contrary, as this amount so greatly exceeded the amounts which, as a matter of common knowledge, are usually paid to directors for their attendance at meetings of the board and the discharge of their customary duties, and was much greater than the amounts that had been paid in prior years,[11] and as there is no showing as to the amounts paid the individual directors, in addition to the salaries of $9,000 which each received—presumably for his services as an executive officer or department manager—or as to the nature, extent or value of their services, the findings raise a strong inference that the unusual and extraordinary amount paid to the directors was not in fact compensation for their services, but merely a distribution of a fixed percentage of the net profits that had no relation to the services rendered.

Therefore, as the Mills has not sustained the burden of showing that the amount disallowed by the Commissioner was in fact part of its ordinary and necessary expenses, the judgment must, for this reason, be

*Affirmed.*

MR. JUSTICE HOLMES agrees with the result.

---

[10] The amount allowed, it may be noted, was, in itself, $481,934.02 more than the average of the amounts that had been paid in the seven years immediately preceding, and $88,466.17 more than the greatest amount that had been paid in any one year.

[11] See note 10, *supra.*