### AMTORG TRADING CORPORATION v. COMMISSIONER OF INTERNAL REVENUE (two cases).

### No. 204.

Circuit Court of Appeals, Second Circuit.

May 29, 1933.

**584**

CHASE, Circuit Judge, dissenting.

Courtland Kelsey, of New York City, for petitioner.

Sewall Key and A. H. Conner, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and J. M. Leinenkugel, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

**L. HAND, Circuit Judge.**

The question at issue upon this appeal is as to the right of the taxpayer to deduct certain charges from its gross income for the years 1924 and 1925, as "ordinary and necessary expenses" under section 234 (a) (1), Revenue Act 1924, 43 Stat. 283, 26 USCA § 986 (a) (1) or as "taxes paid or accrued," under section 234 (a) (3), 26 USCA § 986 (a) (3). The Commissioner disallowed the deductions, the taxpayer appealed to the Board, which affirmed his ruling. The case comes here on appeal from its order. The facts are as follows: The taxpayer is a New York corporation formed in May, 1924, by the consolidation of two others; Products Exchange Corporation and Arcos-America, Inc. About ninety per cent. of its shares were held by individuals in trust for the Bank of Foreign Trade of the Union of Soviet Socialist Republics; the remainder by a British corporation. A majority of the shares of the Bank of Foreign Trade—how large does not appear—was held by the State Bank and the People's Commissariat of Foreign Trade, both governmental agencies of the Union of Soviet Socialist Republics. The other shares of the Bank of Foreign Trade were divided among three classes of holders, the distribution between which is not disclosed. The first class was of industrial "syndicates," having a juristic personality under the laws of the Union, which regulates their activities and taxes them. Their profits are distributed in part to the Union, and in part to those who work in them, the remainder being reserved for surplus and "expansion"; the proportions are not disclosed. By the laws of the Union the "syndicates" are not "branches or agencies of the government," which is not responsible for their engagements. The second class was of co-operative societies to buy and sell, the greater part of whose funds is contributed by the members; the rest lent by the government. They are subject to tax and they pay interest on the loans; the members control them by an equal suffrage, and distribute any profits among themselves. They appear to be like co-operative societies in capitalistic countries. The third class was of organizations with limited liability, whose capital is contributed in part by "syndicates" of the first class, and in part by private or foreign capital. The profits are divided usually in proportion to capital contribution; they are taxed by the Union, which also regulates their undisclosed activities. The shares of the British corporation which held ten per cent. of the taxpayer's shares, were themselves held in trust for the same three classes just described. Thus, the beneficial interest in the taxpayer is held to the extent of ten per cent. by the three classes, through the British corporation, and to an added extent through the Bank of Foreign Trade. This added percentage may be anywhere from one to forty-four per cent. of the whole. The total interest of these classes in the taxpayer's profits may therefore be anywhere between

eleven and fifty-four per cent. Of the classes themselves, the second seems clearly to be wholly private; the first and third are certainly in part so; all the enterprises are conducted as private affairs. The Products Exchange Corporation was one of the two predecessors of the taxpayer, out of which it was consolidated on May 27, 1924. Its business, like the taxpayer's, was to import goods into the United States from Russia on commission, and to buy them here for export thither. How its shares were held does not appear, but no question is made of any difference between it and the taxpayer in this regard. We assume that there was none.

On May 8, 1923, the Council of People's Commissars of the Union promulgated a decree, allowing the Products Exchange Corporation generally to act as buying and selling agent in Russia for the American trade, and directing it to deduct fifty per cent. of its profits to be paid to the People's Commissariat of Foreign and Domestic Trade. What were the governmental powers of the Council of People's Commissars does not appear, though its Concessions Committee had authority over matters relating to foreign trade. Under this decree the Products Exchange Corporation until May 1, 1924, became liable for $725.75, and thereafter for a further undisclosed amount until the organization of the taxpayer and its registration for the purpose of getting rights to trade; that registration being made by the Chief Concessions Committee on June 26, 1924. On November 28, 1924, a contract was made between the taxpayer and the People's Commissariat of Foreign Trade, by which in consideration of the licenses to trade, granted by the Commissariat, which were in turn "to carry out the rights accorded" by the Concessions Committee, the taxpayer agreed to pay to the Commissariat fifty per cent. of its profits up to $100,000 and sixty per cent. beyond. The deductions in controversy are the amounts due under this agreement after July 1, 1924, the date at which it became effective retroactively, together with the amounts for which the Products Exchange Corporation was liable before that time. There is an interregnum between June 26th and July 1st, 1924, which we disregard.

Two questions arise: First, as to whether upon the facts we have set out, the payments were exacted as license fees, and so as an "ordinary and necessary expense," of the taxpayer and its predecessor, in its trade in Russia; second, whether, because of the beneficial interest of the Russian government in the taxpayer, the whole enterprise is more properly to be regarded as a governmental agency, so that the license fees were not an "expense" at all, but a distribution of profits. The first depends upon the right interpretation of the stipulated facts; the second on their legal effect. As to the period after July 1, 1924, there is no doubt that the constituted authorities in Russia intended to impose upon the taxpayer the payments in question as a condition of trading in that country. The decree of June 26, 1924, was in form a "registration * * * for the purpose of granting * * * rights to conduct commercial operations"; it did not profess to license the taxpayer forthwith. The agreement five months later was "to carry out the rights accorded" by this decree; the reference is to the right to apply for licenses. The right to trade did not follow upon registration, for the agreement itself affected to license the taxpayer for the first time, and from substantially the date of registration. Its activities meanwhile could only have been upon condition that such fees should be paid, as might be later decided. The fees themselves were expressly in consideration of the licenses; that they were fixed by contract rather than by law did not make them less imperative as conditions. The form was indeed different from that adopted in the case of the Products Exchange Corporation, in which the decree which licensed the company itself imposed the fees, but with that we need not concern ourselves.

A formal question arises as to the period before July first. This is because, although it was stipulated that the Chief Commissions Committee of the People's Council of Commissars had authority over foreign trade, the Council itself was not included. The amount at stake is small and the point narrow. Possibly, since our own government has not recognized the existing government of Russia, we should not accord to its doings that presumption of regularity that usually obtains. Nevertheless, when it is once conceded that the committee was authorized to make the exaction, it would press unreasonably the burden of proof to stick at the exercise of the same power by the principal itself. Certainly that would run counter to our own notions of delegated power, and these appear to us to involve only such conceptions as are extremely unlikely not to prevail even under a system of law as different as that of Russia. It is of course possible that the subsidiary alone had the power, but since the principal exercised it with show of authority, the chances that it was not war-

ranted are so small that we think the taxpayer has established the fact prima facie. That is enough to satisfy the burden of proof when the evidence is not in conflict.

Coming to the points of law, we think that the payments fall within section 234 (a) (1) as "ordinary and necessary" expenses. That they were necessary to the conduct of the business we have already given our reasons to suppose. That they were "ordinary" in the sense that they were imposed upon other persons dealing in Russia, does not indeed appear. But that, as we conceive it, is not the pertinent inquiry; the expense is "ordinary," if it is of a kind similar to what arises in other similar situations. Such charges are indeed "ordinary" in the case of domestic corporations doing business beyond the borders of the state wherein they are organized. That is enough.

The final question is whether to regard the payments as "expenses" at all, or only as a cover for the distribution of profits. If so, they cannot be deducted. Botany Worsted Mills v. U. S., 278 U. S. 282, 49 S. Ct. 129, 73 L. Ed. 379. Judged by their final incidence they were in part expenses, in part distributions; what is the proper division we cannot know except within the limits given above. If the taxpayer had been wholly a governmental agency, convenient for local purposes of American trade, and if the government had held the entire beneficial interest in it, the payments would no doubt be distributions. So far we should be justified in disregarding the corporate form adopted. Had that been true, it would have been most extraordinary to impose a license fee; hardly explicable except as an effort to escape taxation. But there were concededly private interests. Perhaps if these had been so small as to be negligible we might treat the case as though they did not exist at all. They are too substantial for that. If we regarded the taxpayer merely as an aggregate, we could ignore the corporate unity altogether, and consider the diverse interests which it disguises in order to effect the underlying purpose of the statute. There would then have been two separate groups, as to one of which the payments were expenses, as to the other, distributions; deductions could be allowed so far only as they were the first, leaving the resulting intra corporate adjustments to be made by the groups themselves. But the statute is not made in that frame; it treats the corporation as the taxpayer and disregards relations between its constituents. In re General Film Corporation, 274 F. 903 (C. C. A. 2); Appeal of Webb Press Co., 3 B. T. A. 247; Home Builders Shipping Ass'n v. Com'r of Internal Revenue, 8 B. T. A. 903. In cases where the recipients of the putative expenses are themselves subject to taxation, no income escapes taxation; they may be assessed upon what they have received. But we apprehend that the result should not be different, though the recipients are not subject to taxation; as for example, if they are foreign owners of patents for which they charge royalties to the corporate taxpayer. Some way would have to be found to assess them personally for the payments; it would make no difference in the corporate tax, if no way could be found. It would indeed make a difference if the payments had themselves been fixed with an eye to taxes; or if for any other reason they were not truly what they appeared. That was the situation in Botany Worsted Mills v. U. S., supra, 278 U. S. 282, 49 S. Ct. 129, 73 L. Ed. 379. But there is no reason here to suspect that the Russian government fixed the fees higher than if it had had no interest in the corporation.

The situation is one with which Congress may see fit to deal specially; to provide that when expenses are paid to shareholders of the taxpayer who are not assessable, any deductions because of them must be allocated. We cannot interpolate such an exception into a system so detailed and elaborate. Unless we do, we should have to commit ourselves to the general doctrine that any payments made to a shareholder must be apportioned, though they are "ordinary and necessary expenses," arising from legal transactions between him and the corporation, whose good faith is not impugned. That would certainly be unwarranted. We do not see that our recent decision in All Russian Textile Syndicate, Inc., v. Commissioner, 62 F.(2d) 614, touched upon the situation; the only question there was whether the taxpayer's agreement to pay over profits, changed their character as such.

Order reversed; deficiencies expunged.

CHASE, Circuit Judge, dissents without opinion.