UNITED STATES of America, Plaintiff-Appellee,

v.

THE SHOTWELL MANUFACTURING COMPANY, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Byron A. CAIN, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Frank J. HUEBNER, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Harold E. SULLIVAN, Defendant-Appellant.

Nos. 11108-11111.

United States Court of Appeals Seventh Circuit.

June 15, 1955.

As Amended on Denial of Rehearing Aug. 18, 1955.

George B. Christensen, Vincent O'Brien, Howard Ellis, William T. Kirby, Chicago, Ill., Edward J. Wendrow, Richard L. Wattling, Chicago, Ill., Robert 'H. Klugman, Chicago, Ill., Kirkland, Fleming, Green, Martin & Ellis, McAdams & Kirby, Winston, Strawn, Black & Towner, Defrees, Fiske, O'Brien & Thomson, Chicago, Ill., of counsel, for defendant-appellants.

H. Brian Holland, Asst. Atty. Gen., Joseph M. Howard, Atty., U. S. Dept. of Justice, Washington, D. C., Ellis N. Slack, John H. Mitchell, Washington, D. C., for the United States.

Before LINDLEY, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Shotwell Manufacturing Company, a corporation (sometimes herein referred to as Shotwell) and Byron A. Cain, Frank J. Huebner and Harold E. Sullivan, its officers, were indicted on two

counts on March 14, 1952, for allegedly wilfully and knowingly attempting to defeat and evade a large part of the income taxes due and owing by Shotwell to the United States of America for the calendar years 1945 and 1946, in violation of section 145(b) of the Internal Revenue Code,[1] in that defendants filed and caused to be filed false and fraudulent tax returns for said corporation.

After trial on pleas of not guilty, the jury found all of the defendants guilty on both counts. Judgments of conviction were entered on the verdict, Shotwell was fined $10,000 on each count, the individual defendants were sentenced to three years' imprisonment on each count (to run concurrently), Cain was fined $5,000 on each count, Huebner was fined $5,000 on each count, and Sullivan was fined $2,500 on each count. The defendants have severally appealed.

The errors relied on arise out of the alleged insufficiency of the evidence to support the verdict; the failure of the court to sustain defendants' motions to dismiss; the failure of the court to sustain motions to suppress documents and information prepared or furnished by defendants for the government during an alleged disclosure; certain rulings on evidence and instructions; and denial of motions for new trial.

 1. The trial court was correct in denying defendants' two motions to dismiss the indictment, in the nature of special pleas in bar. These motions were based on the theory that defendants had acquired immunity from criminal prosecution by making a "voluntary disclosure", in reliance upon an announced policy of the Treasury Department not to prosecute in cases where such a disclosure had been made.

There was no statutory basis for the alleged promises of immunity announced by the various Treasury Department officials.[2] Thus the making of a voluntary disclosure by the defendants was no legal bar to a criminal prosecution. Only an act of Congress could create such immunity. In the absence of statute, a defendant cannot enforce such a promise and "cannot by law plead such facts in bar of any indictment against him, nor avail himself of it upon his trial, * * *" In re Whiskey Cases, 99 U.S. 594, 25 L. Ed. 399, 400.

██ Defendants contend, however, that there is a statutory basis for the voluntary disclosure policy in the power of the Secretary of the Treasury to compromise any civil or criminal case under § 3761 of the Internal Revenue Code of 1939.[3] This same argument was squarely met and disposed of in United States v Lustig, 2 Cir., 163 F.2d 85, 89 [3a] where the court said:

"The compromise statute[4] affords no shield to one who has violated the tax laws unless there has actually been a compromise. See Botany Worsted Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379. It is not even claimed here that there was more than an offer to make a compromise. None of the formalities prescribed by the statute and treated by the Supreme Court as necessary to effect a compromise were observed. Botany Worsted Mills v. United States, supra, 278 U.S. at pages 288–289, 49 S. Ct. 129, 73 L.Ed. 379. There was no issue of fact for court or jury as to whether a contract of compromise had been made. Accordingly there is no merit in the defense of immunity."

The language of the Lustig opinion is fully applicable to the case at bar. The

---

1. 26 U.S.C.A. § 145(b).

2. "At the outset, it is most important to point out that this policy of the Bureau of Internal Revenue not to recommend criminal prosecution where the taxpayer had made a voluntary disclosure before the investigation started, had no basis either in statute, rule or regulation." Bal-

ter, Fraud Under Federal Tax Law, Second Ed.1953, p. 102.

3. 26 U.S.C.A. § 3761.

3a. Certiorari denied 332 U.S. 775, 68 S.Ct. 88, 92 L.Ed. 360.

4. 26 U.S.C.A. § 3761.

Treasury Department officials did not have the power to confer immunity on persons making voluntary disclosures, defendants' voluntary disclosure was not a statutory compromise of a criminal case and did not entitle them to immunity, and the motions to dismiss the indictment were properly denied.

2. A timely motion by defendants, supported by affidavits, and later amended, was made before trial to suppress certain evidence in the possession of the government. The motion averred that the evidence had been produced by defendants in reliance on a promise of immunity. More specifically, it averred that the Bureau of Internal Revenue, through the Secretary of the Treasury, the Commissioner of Internal Revenue, and other responsible treasury officials thereunto duly authorized, publicly offered and held out to all of those whose income tax returns contained omissions or misstatements, that there would be immunity from criminal prosecution in any case where the taxpayer who filed such return would come forward before investigation had been initiated and acknowledge the existence in such return of omissions for misstatements, and the Treasury Department in such case would merely assess such unpaid tax, interest, civil penalties, if any, as might thereafter be determined to be due, and that said offer was and had been in full force and effect. The motion likewise set forth that such timely acknowledgment was made to a responsible officer or agent of the Treasury Department in January, 1948 of the returns of Shotwell for the years mentioned in the indictment; that the defendants informed said agents of the Treasury Department, among other things, that said returns contained omissions and misstatements in that they intentionally failed to include, under the heading of gross sales, all or part of the sums received by Shotwell through sales of goods, and they failed also to include under the heading of "costs of goods sold", various payments made by defendants for said goods, which receipts and payments were in excess of the ceiling prices [5] as set by the laws and regulations of the United States at the time such goods were purchased. It was also stated in the motion that the defendants at said times stated that Shotwell, through its officers, was ready, able and willing to pay such unpaid tax, interest and civil penalties, if any, as might be determined to be due after inspection and investigation by the agents of the Bureau of Internal Revenue. The motion also set forth that, at the time of the disclosure, Shotwell's over-the-ceiling payments for raw material were not deductible as a part of the cost of goods sold, under the rulings of the Commissioner.

The motion also averred that the officers and agents of the Treasury Department acknowledged the sufficiency and timeliness of the disclosure, and that the defendants, at the request of said officers, caused to be made available to them the books and records of Shotwell, and the individual defendants communicated to them information in their possession materially related to said omissions and misstatements and not available to such officers and agents through said corporate books and records, which information could not have been obtained from the individual defendants in any manner in view of their constitutional privilege and rights, and also that the defendants caused certain accountants to be employed to assist the said agents in obtaining the facts. Shotwell thus incurred and paid auditing charges in excess of $20,000.

The motion also set forth in substance that in pursuance of the foregoing, the Treasury officials examined the corporate books, records and data, and made copies thereof continuously over a period of more than four years preceding the return of the indictment, and did not advise the defendants that said disclosure was untimely or insufficient, or that criminal prosecution was or had been contemplat-

---

5. Fixed pursuant to 50 U.S.C.A.Appendix, § 902.

ed, or that it might be recommended; that, notwithstanding the foregoing, said officials shortly before the proceedings before the grand jury which resulted in the indictment herein, repudiated the said offer so relied and acted upon by the defendants, without granting to them any hearing or conference, and without communicating to them the amount which, upon such inspection, the Bureau of Internal Revenue had determined to be due, and without affording Shotwell or said officers on its behalf, an opportunity to pay such amount. The motion charged that the said actions of the Bureau of Internal Revenue constituted an improper inducement of a confession or admission of facts upon which a criminal prosecution might be based and an illegal search and seizure of the books, papers and records of the defendants, and that, in consequence, the admission in evidence of all books, records, papers and statements so obtained, and any copies thereof or data procured therefrom as a result of information obtained therefrom, would violate the rights of the defendants under the fourth and fifth amendments to the constitution of the United States.

A hearing was held on the motion to suppress. The following is a statement of the facts proved, including only those facts shown by the government's evidence wherever there was a conflict.

Leon J. Busby, a certified public accountant under the laws of Illinois, was a member of the firm of Busby and Oury, located in Chicago. Beginning in 1942 that firm did the general auditing work of Shotwell for the purpose of certifying financial statements used in credit channels. The firm prepared Shotwell's income tax returns, installed efficiency systems, and did other matters of a general accounting nature.

In January, 1948, at the request of defendant Cain, Busby made a trip with Stanley Graflund, vice-president and comptroller of Shotwell, to the plant of General Confections Company in New York, to determine whether a loan of $50,000 to General Confections, request-

ed by David G. Lubben, would be financially secure. Having made a cursory survey, he reported to the Shotwell officers, including Graflund and defendants Cain and Huebner, that the survey did not justify such a loan.

Although Busby was active in the supervision of the auditing work for Shotwell, he did not know that Shotwell had received over-ceiling or premium payments. During this trip Graflund told him of that condition. In reporting on January 11, 1948 to Cain and Sullivan, Busby recommended against making the loan, and told of Graflund's revelation about the collection of over-ceiling prices for candy sold by Shotwell to General Confections, that Graflund had said that he did not know how much the over-ceiling payments were, and that he (Graflund) also thought "the money had been paid out by Shotwell." Busby said that he told Cain and Sullivan that, while it might not be that Shotwell was in a serious position, they should file an amended return to get the matter on record, and they discussed it for a while. Cain and Sullivan readily admitted the over-ceiling payments. They asked Busby "whether or not it would be in order to discuss the matter with the department." Busby told them that he thought it would and that, even if they made the disclosure, which was, in his opinion, the customary thing to do, "there probably would be nothing to it except that it would clear Shotwell of omissions from the tax returns." Busby directed their attention to the fact that it was a common thing to make disclosures to the department, and in so doing he did not see that there were any serious consequences, and that "there wouldn't be any critical attitude of the department towards them."

This discussion about making a disclosure occurred off and on between these men for a couple of weeks. They assigned Busby to communicate with the department, after having discussed the possibility of sending a lawyer.

About March 15, 1948, Busby went to the office of the Chief Deputy Collector

in Chicago, Ernest Sauber, and told Sauber that he had a client which had been engaged in over-ceiling sales and over-ceiling purchases, which were not reflected in its books, that the client "wants to clean up some omissions from his tax return", that he [Busby] had been asked to prepare amended returns; that he had been unable to ascertain the exact figures and he did not know how he could prepare amended returns without having the figures, and he asked Sauber's advice on how to proceed. In response to Sauber's inquiry, Busby said that these transactions were handled all in cash, the part representing the over-ceiling payments was kept in a cash box, which cash was used to make over-ceiling purchases; that said transactions to a large extent "washed each other"; that when it was no longer necessary to make over-ceiling sales and purchases, the balance in the cash box was taken into the corporate records and declared as income for the year that the OPA ceiling ceased to exist. Busby told Sauber that "we wanted to go into the matter and have the agent come out and examine the situation and see what the real condition was and if there was any net amount due to the Government, we wanted to pay it."

Sauber told Busby that he could not prepare amended returns on the basis of his then knowledge, and suggested that Busby get statements from every individual at Shotwell who had anything to do with these transactions, and therefrom reconstruct the figures necessary for an accurate return, and after the figures had been reconstructed to ask the internal revenue agent's office to audit the Shotwell return. On this occasion Sauber advised Busby that if the disclosure was timely and the facts that he had related to Sauber were correct, the latter saw no reason why the immunity from criminal prosecution policy of the Bureau should not be applied.

The next day Busby met Cain, Huebner and Sullivan and told them that Sauber recommended that one of the officers come forward and disclose the identity of the taxpayer and "that if this were done, they should proceed to determine as nearly as possible how much was involved, and he saw no reason why there should be any trouble with respect to criminal prosecution in case of timely disclosure." Sauber had said that either an officer of the company or its representative could make the disclosure. Busby also told the individual defendants that Sauber said that there was no need for amended returns. Cain, president of Shotwell, told Busby to go to the collector's office and "disclose the whole affair, the whole details."

On one of various visits of Busby to Sauber's office, Sauber asked if Busby knew how much was involved, and when given a negative answer and told that Shotwell had no specific records from which that could be determined, Sauber suggested that Busby gather "such information as we could from any memorandum or memory and summarize it on a form, and in the meanwhile he would contact the office of the agent in charge and have an auditor come out and work with us for the purpose of substantiating or getting together the true facts as nearly as could be accomplished." Sauber said that he would have the Agent in Charge, Mr. Wright, send out an agent to verify the summarization, or to help compile it. He said that the Agent "was to cover an examination of the books which would include just about a routine audit, verification of the tax returns; that he would examine the books and any other data that we had to submit to him."

Within a week Busby brought Cain into Sauber's office and said that Shotwell was the client that he had referred to in the previous meeting. Cain then told Sauber the same story that Busby had told him, and that "they did not know how to proceed in order to correct their tax returns." Sauber gave Cain the same advice he had given Busby, and told him "to ask for an audit of their returns."

Cain told Sauber that he had two boys in school and he was worried about publicity, and Sauber said that there would be no publicity on the case, that the only

time an income tax case received publicity was when there was an indictment. Sauber told Cain that in his opinion this was strictly a civil case and that it was not a criminal case, and that he had nothing to worry about so far as publicity was concerned.

About thirty days thereafter (latter part of April, 1948), Cain telephoned to Sauber and said that his advice had been followed, a meeting of all Shotwell people connected with the black market transactions had been held, and that figures had been prepared which he would like to come in and turn over to Sauber. The latter said that he had no jurisdiction in the case, that corporation returns were handled by the Revenue Agent's office, which he should call and request an audit of the Shotwell returns. At Cain's request, Sauber called the Revenue Agent's office. Ralph Johnson, the group chief in that office, agreed to do it. Johnson said he would schedule the returns for audit. Sauber said the cases had not been assigned for audit to any particular agent.

Thirty days later and several times thereafter, Cain called Sauber and stated that no one had come from the department. He was very insistent that the audit be started. Sauber learned by inquiry at the Revenue Agent's office that there had been delays there due to misunderstanding in regard to the name of Shotwell. Sauber reported this fact to Cain.

From 1945 through 1948 the procedure in the office of the Collector of Internal Revenue in regard to corporate returns was that after returns were filed with the collector they were sent to the Bureau at Washington for statistical purposes and for clarification purposes. The Bureau would make a survey of the returns and select those which it believed were worthy of examination in the field. They were then sent to the office of the Internal Revenue Agent in Charge and there was a further classification made of those returns in the local office. Those returns which a local office believed required investigation were retained, sent to the record section where an office card record was made and then they would be sent to the various groups for investigation by their agents.

As to the Shotwell return for 1945, the card record fails to show on what date it was determined that the return should be audited or investigated. What the card does show, as interpreted by Holz, a government witness, is as follows: On January 15, 1947, the 1945 income tax return and the 1945 excess profits tax return of Shotwell, were assigned to Group Chief Magnus for audit in the field, and Magnus assigned them to Agent Korman on January 20, 1947. Korman filed a report on August 5, 1947, and either then or later an agreement was signed consenting to the assessments of deficiencies, such agreement specifying that the taxpayer waived his right to petition the tax court, and consenting to an immediate assessment of the deficiencies. This may have occurred at any time from August 8, 1947 to September 26, 1947, when the card record indicates that the case was disposed of.

As to the 1946 Shotwell return, the card record indicates that on December 11, 1947, the card was made out, and that on December 16, 1947, the return was assigned to Group Chief Granahan for investigation in the field by one of his agents, which means for an audit. On July 22, 1948, the card indicates the return was sent to Group Chief Johnson, and then on February 4, 1949, to Group Chief Williams, now deceased. The record is silent as to when any investigation or audit commenced as to the 1946 Shotwell return.

In 1949 Cain called Sauber and reported that three men had been auditing the Shotwell returns, and asked what could be done to expedite the closing of the case. Sauber referred him to Wright, Internal Revenue Agent in Charge. A week later Cain told Sauber that he had seen Wright and had "gotten nowhere" with him, and requested Sauber to find out what the difficulty was. After talking to Wright, Sauber advised Cain that the difficulty was Shotwell "would not tell

402

the Government to whom the over-the-ceiling purchase payments had been paid, and until such time as the Shotwell Manufacturing Company would tell the Government or identify the persons receiving the over-the-ceiling purchase payments, the case would not be closed, that they would be required to cooperate with the Government before they would consider closing the case."

Cain then told Sauber "he could not identify the persons receiving these payments; the only persons that he knew of was a Dr. Doe in the Board of Trade Building, that someone had sent some money to, and that he himself thought it was a fictitious name and he would not appear ridiculous naming a Dr. Doe, and that was the only person he knew that had received any of these payments, and he would not reveal that name because he himself thought it was fictitious."

All corporate records were made available to revenue agents Krane and Mammel.

Revenue agent Krane came to work at the Shotwell plant in June or July, 1948, and he came in from time to time over a long period of time. In July, 1948, Busby, having prepared a tentative schedule, gave it to the revenue agent when he appeared at the plant to examine the books.[6]

On February 7, 1949, revenue agent Mammel was given the Shotwell case. He had nothing to do with a decision as to whether there should be a recommendation of prosecution. The discretion in that regard was vested in the Intelligence Office, and he was not in that office. Although he could recommend a prosecution, those vested with authority could refuse to prosecute. In March of 1949, he talked to defendant Cain and told Cain that there might possibly be prosecution and therefore he (Mammel) had to do a perfect job in his investigation [of the accounts of Shotwell] so that he would not have to do the work over again. He did not tell Cain that he con-

sidered what they had done constituted a voluntary disclosure.

Early in 1951, Cain and Sullivan visited Wright and discussed the case in detail, at which time Cain stated that he wanted a bill. Wright again assured them "that he would check into it and see if a bill could be brought forth."

Cain asked Wright if they "couldn't get the tax matter settled."

Prior to the indictment on March 14, 1952, the defendants were never notified what amount of tax the Bureau of Internal Revenue had determined was due.

On May 28, 1945, former Secretary of the Treasury Morgenthau stated at a press conference that "some taxpayers who have failed to declare their full income and pay the tax due may escape criminal prosecution through voluntary disclosure of the deficiency only in cases where such voluntary disclosure is made before investigation is started."

On August 21, 1945, former Secretary of the Treasury Vinson stated through the press: "No one is going to jail for an honest mistake in filling out his tax return. Treasury policy even permits the wilful evader to escape prosecution if he repents in time. The Commissioner of Internal Revenue does not recommend criminal prosecution in the case of any taxpayer who makes a voluntary disclosure of omission or other misstatement in his tax return * * *. Monetary penalties may be imposed for delinquency, for negligence and for fraud, but the man who makes a disclosure before an investigation is under way protects himself and his family from the stigma of a felony conviction. And there is nothing complicated about going to a collector or other revenue officer and simply saying, 'There is something wrong with my return and I want to straighten it out.'"

On October 15, 1945, the then Commissioner of Internal Revenue "stressed the bureau policy of refraining from instituting criminal proceedings against

6. This compilation was introduced in evidence by the government at the trial.

taxpayers who come forward voluntarily and pay up delinquencies plus interest and civil penalties before the Bureau has begun investigating their cases."

On May 14, 1947 the chief counsel of the Bureau of Internal Revenue said in the course of an address: "The law requires the prosecution of the tax evader and that is what the Department recommends to the Attorney General. There is one important exception to that. * * The Department has always encouraged voluntary disclosures. * * * The making of a voluntary disclosure is a simple thing. The taxpayer or his legal agent can go before any official of the Bureau of Internal Revenue or any of its field offices—whether it is the collector, a deputy collector, a revenue agent, a special agent, or any other responsible Treasury officer. There is no special form for making the disclosure. The simple statement that 'I have filed false tax returns and I want to make the government whole,' would constitute a complete disclosure. * * * "

The government's brief sets forth the following as the reasons the district court denied the motion to suppress:

The Treasury's voluntary disclosure policy required (1) the disclosure of a tax deficiency, (2) an admission that the taxes due had been wilfully evaded, and (3) good faith cooperation with the government thereafter in determining the amount of taxes due. The court made the following findings of fact: that appellants had never disclosed unreported income; that they had consistently denied any intent to evade taxes; that, far from showing good faith, they had attempted to deceive the revenue agents during the investigation; and that no government official had represented to appellants that their alleged disclosure would result in immunity from criminal prosecution.

In seeking to sustain the action of the district court in denying defendants' motion to suppress certain evidence, the government in its brief relies upon the reasons given by the district court, and adds that, "although the taxpayer who made a voluntary disclosure was not entitled to immunity from prosecution, an entirely different question would, of course, arise if the disclosure was made fully and fairly and in reliance on the policy, and if the action of the investigating agents gave the taxpayer good reason to believe that the Treasury would not recommend prosecution." The government contends that "that question has been determined adversely to appellants by the trial court's findings of fact, amply supported by the evidence summarized above, to the effect that the testimony at the suppression hearing indicated an entire absence of good faith on the part of appellants and no misleading actions or improper inducement on the part of the Government representatives."

It is obvious that both the district court and government counsel concede the existence of the Treasury Department's voluntary disclosure policy, and that the policy itself had valid legal standing. The differences of opinion here pertain to the application of the policy to this case.

■ (a) The evidence shows that defendants did disclose unreported taxable income. Their admission that they had omitted from Shotwell's return, over-the-ceiling receipts for candy sold, revealed income which should have been considered in fixing its tax, according to the Treasury Department's ruling that illegal payments for goods purchased were not deductible for tax purposes.

■ (b) While they coupled a disclosure of unreported income with a *legal* suggestion that that income was not taxable because it was offset by disbursements substantially equivalent thereto for over-the-ceiling purchases of raw material, contrary to the then legal contentions of the Treasury Department, they did disclose the *facts*. The voluntary disclosure policy referred to the disclosure of facts, and not to the disclosure of the legal contentions of a taxpayer's lawyer. Actually the legal contention made by the defendants at that time was not fantastic or unreasonable. This is established by

the department's later reversal of its stand on such offsetting illegal disbursements, and its adoption of the same view that defendants suggested as to the law.[7] Therefore defendants' contention did not cast any doubt upon their good faith in making their disclosure of facts.

■ Nor was bad faith on their part evidenced by their conduct after making their offer of disclosure. They cooperated to the extent that they were able, and in complete compliance with the policy of the department. The insistence of the revenue agents that defendants go beyond their duty of disclosing facts material to the determination of their unreported tax liability, by informing the government of the names of the persons to whom they paid over-the-ceiling prices for raw materials, was met with a refusal by defendants. This refusal was not inconsistent with a full disclosure of relevant facts on their tax liability. First, in the various statements of the voluntary disclosure policy, there is no suggestion or requirement that a taxpayer must furnish information for the prosecution of others, except insofar as that information may be incidental to a determination of his own tax liability, and, secondly, in view of the government's position that payments by defendants of over-the-ceiling prices were not germane to the computation of defendants' tax liability, the identification of the persons receiving those payments was irrelevant. It can hardly be contended that a taxpayer, who comes in and admits that he incorrectly reported his income for tax purposes, can be required to become an informer against persons who may be criminally liable in transactions which are not pertinent to his tax liability.

We therefore hold that defendants' inability or refusal to name the recipients of Shotwell's illegal disbursements, did not show that their offer of disclosure was in bad faith.

■ (c) When confronted with defendants' admission that Shotwell had intentionally omitted taxable income from its 1945 and 1946 income returns, and an expressed willingness to pay what was due, and to cooperate with the Bureau of Internal Revenue in taking whatever steps were necessary to establish the amount thereof, the responsible heads of the Bureau in Chicago not only said nothing to indicate that the offer was rejected, but, in complete harmony with the policy of the Treasury Department in regard to voluntary disclosures, accepted the cooperation of the defendants and thereby obtained access to Shotwell's books and records, and conducted investigations which continued until an indictment was filed in the district court.

From March, 1948, when defendants made their disclosure to Chief Deputy Collector Sauber, until March 14, 1952, when the indictment was filed, defendants were led to believe by the government representatives that the course which they were pursuing would avert their criminal prosecution. At the March 15, 1948, conference between Busby and Sauber, when the nature of the income omissions was frankly outlined by Busby, Sauber said that, if the disclosure was timely and the related facts were correct, he saw no reason why the immunity from criminal prosecution policy of the Bureau should not be applied. Later Sauber told Cain, who was worried about publicity, that there would be no publicity in this case, that the only time an income tax case received publicity was when there was an indictment. He expressed the opinion that this was strictly a civil case, and not a criminal case, and that Cain had nothing to worry about so far as publicity was concerned. This statement is corroborative of defendants' contention that immunity from such prosecution had been offered in return for a voluntary disclosure under the department's policy.

Early in 1951, Agent in Charge Wright told the defendants, who repeated prior requests that they be given a

---

7. The Commissioner later acquiesced in court decisions which held such deductions allowable.

bill for their taxes so they could pay it, that he would check into the matter and see if a bill could be brought forth. As late as October, 1951, Wright's assistant, Oscar Olson, told Cain that he had nothing to worry about at all.

These expressions from the representatives of the government, paralleling the Treasury Department's policy not to "recommend criminal prosecution in the case of any taxpayer who makes a voluntary disclosure of omission or other misstatement in his tax return," conclusively show that responsible government officials, from cabinet level to local level, had represented to defendants that their disclosure would result in immunity from criminal prosecution.

The government does not effectively support its contentions when it says that "As early as February, 1949, Cain was told by the examining agents that prosecution was possible." This is because first, Mammel, who is the agent who made such a statement, had no authority to decide who should be prosecuted and, secondly, if this were to be an announcement of intention by the government to prosecute the defendants, it came almost a year after the disclosure had been made by the defendants and accepted by the revenue officials, and long after the government, by means of the disclosure, had obtained information and records which it used in the prosecution of this case.

■ (d) The government seems to contend in this court that when the defendants made their disclosure they should have used words indicating that they had perpetrated a fraud upon the government or, as otherwise expressed, that they had wilful intent to evade taxes. Their disclosure showed that they knew that they had over-ceiling income, and that they had intentionally not reported it. That was all that was necessary. Nothing in the pronouncement of the policy required them, in making a disclosure, to use the language of a lawyer in characterizing their failure to report taxable income.

■ The application of the disclosure policy is not conditioned upon the officers of the corporate taxpayer exhibiting to the representatives of the Commissioner of Internal Revenue a contrite spirit. It is not required by the policy that they appear in sackcloth and ashes and seek absolution from the internal revenue agent, or that he occupy the office of father confessor. When the taxpayer's representatives avail themselves of this policy they are not seeking moral forgiveness. The transaction is entirely amoral, one side seeking to avoid the criminal penalties which they have risked by their incomplete or erroneous return of income, and the government agents being engaged in the mundane purpose of collecting federal taxes.

We hold that as against this attack of the government, the disclosure by defendants was not defective.

■ (e) In a footnote in its brief in this court, the government makes an oblique attack upon the timeliness of defendants' disclosure. We think the facts in evidence show that when the disclosure was made, no investigation involving the over-ceiling income of Shotwell during the taxable years had been started or even suggested or contemplated by the government. The disclosure was timely.

■ When the revenue agents get the scent and are in pursuit of the miscreant, it is too late for him to seek the protection of the Treasury Department's voluntary disclosure policy. Until then its door is open and the welcome mat is out.

■ (f) There is no inconsistency between the voluntary disclosure and the statement by Cain that the defendants would contest an assessment when made. That is the right of any taxpayer who would question the method of determining his tax assessment. By making a disclosure of facts upon which an assessment can be made, a taxpayer is not deprived of his right to be heard on the method used in making the assessment.

██ We hold that defendants made a valid voluntary disclosure in reliance upon promises of immunity. The evidence thereby obtained by the government stands on the same footing as an oral or a written confession induced by such a promise. The use of such evidence at the trial was a violation of each defendant's privilege against being compelled in any criminal case to be a witness against himself, as guaranteed by the Fifth Amendment to the constitution of the United States.

It therefore follows that the court erred in denying the motion, as amended, to suppress such evidence. The use of that evidence at the trial makes it necessary to reverse the conviction of the defendants.

In view of the fact that a retrial will be required in this case, we find it unnecessary to rule on defendant Sullivan's contention that the district court erred in overruling his motion for a separate trial made at the close of the government's case-in-chief. Upon his retrial he is free to make a timely motion for severance. We express no opinion as to what the ruling thereon should be.

Inasmuch as important and substantial evidence should have been suppressed, the case must be retried. It is unnecessary to express an opinion as to whether the remaining evidence upon the trial below did or did not establish defendants' guilt, or to pass upon the other errors relied upon.

For the reasons hereinbefore set forth, the judgments of the district court are reversed, with instructions to sustain defendants' motion as amended to suppress evidence, and to retry the case.

Reversed and remanded with instructions.

LINDLEY, Circuit Judge (dissenting).

I regret that I cannot agree with the result reached by my brethern.

Disregarding the merits of the suppression question for the moment, it seems to me the majority fails to define clearly its interpretation of the Bureau's voluntary disclosure policy. The legal issue involved on this phase of the case seems to me to require an explicit determination of just what that policy is, whereas the language of the majority, I think, leaves the resolution of that question in doubt.

As to the merits of the order denying suppression, in the first place, I believe that the majority has overlooked the nature of the issues raised by the motion to suppress. These include the legal question of interpretation of the Government's voluntary disclosure pronouncements and, in addition, the question of fact as to whether defendants made a voluntary disclosure within the purview of the announced policy. And if these two issues should be resolved in defendants' favor, a further question then arises, in the light of the reported cases, of whether evidence given to the Treasury officials in reliance on the disclosure policy will be suppressed. That question is by no means settled. Compare Centracchio v. Garrity, 1 Cir., 198 F.2d 382, 388, certiorari denied 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 672, with In re Liebster, D. C., 91 F.Supp. 814.

Reverting to the legal question of interpretation of the policy statements, it seems to me the majority opinion turns on an assumption that any action by a taxpayer which advises a Treasury official that a tax return previously filed by him is incorrect or incomplete is a sufficient disclosure. Paraphrasing the language in part, the majority opinion seems to hold that any word which is sufficient to put the Treasury bloodhounds on the scent of a fraudulent return is a sufficient disclosure, irrespective of what facts are revealed to or concealed thereby from the government and irrespective of what roadblocks the taxpayer may thereafter erect in the way of a determination of the true facts surrounding the fraudulent return. Then, as I construe the majority's expressions, any evidence that the taxpayer may

thereafter surrender to treasury agents must be suppressed, if criminal prosecution is recommended when the fraudulent omission is discovered.

Such a broad statement of the doctrine, I think, is an unwarranted interpretation of the Treasury policy. The Wenchel statement, upon which defendants place principal reliance, when considered in its entirety, carries with it the clear implication that the disclosure contemplated must be a full disclosure of all facts bearing on the false return. Secretary Snyder's statement, issued about 10 days after the Wenchel statement, after referring to the long existent policy, concluded that the application of the policy to a particular taxpayer "presumes, of course, that the repentant taxpayer cooperates with agents of the Bureau in determining the true tax liability."

Furthermore, I think the broad interpretation on which the majority opinion rests ignores persuasive judicial pronouncements bearing on this question. The Court of Appeals for the First Circuit in the Centracchio case, supra, said at 198 F.2d at page 389: "If it be assumed * * * that evidence disclosed to the Treasury officials on the faith of the announced voluntary disclosure policy, and in compliance with its conditions, should be excluded from evidence in a subsequent criminal trial, it would seem that the taxpayer would have to satisfy the court that he made a voluntary, good faith disclosure of all data necessary to a correct computation of his income tax deficiencies, and that he made such disclosures before an investigation was under way." And in In re Monroe, D.C., 110 F.Supp. 507, affirmed 5 Cir., 215 F.2d 81, certiorari denied 348 U.S. 914, 75 S. Ct. 294, the court defined the disclosure policy as containing the specification that the disclosure must be "a complete, fair and honest disclosure, and not a portion." While these authorities are not binding on us, the reasonable interpretation adopted by the jurists who penned those opinions is entitled to our respect and

deserving of our serious consideration. See also Chieftain Pontiac Corp. v. Julian, 1 Cir., 209 F.2d 657.

The question, basically, is what would the average taxpayer understand, after reading the Treasury statements, as to what would constitute a sufficient disclosure thereunder. The trial court, consistently with the pronouncements made in Centracchio and Monroe, applied the rule of reason that a "disclosure" requires a good faith disclosure of all facts pertinent to the fraudulent return. This, I believe, is a correct analysis of the policy as announced and, insofar as the majority opinion is based on a less restrictive rule, I respectfully dissent.

The second point on which I believe the majority falls into error is in its treatment of the suppression question as one wholly of law. It seems to me that the majority attempts to try the factual issues *de novo* and fails to give the requisite weight to the trial court's findings of fact which are essential elements of the question under review.

The weight to be accorded by a court of appeals to such findings has been variously defined. In Roberson v. United States, 6 Cir., 165 F.2d 752, at page 754, the court pointed out that "the finding of the trial judge on a preliminary question of fact should not be reversed on appeal if it be fairly supported by the evidence." In Nichols v. United States, 8 Cir., 176 F.2d 431, at page 432, the court said: "The facts as determined by the trial court are supported by evidence * * * and are binding on this Court." And in Cannon v. United States, 5 Cir., 166 F.2d 85, at pages 86–87, the court's language was: "It cannot be said that the judge's findings on this question were without substantial support. Therefore we will not disturb those findings."

In each of these cases, the findings to which reference was had were made by the trial court in ruling on a motion to suppress evidence allegedly obtained by an illegal search and seizure. While these decisions, as well as the subsequently adopted rule which embodies the then

existing case law,[1] pertain only to the classic search and seizure question rather than to the Treasury's voluntary disclosure doctrine, the proceeding to suppress the evidence is the same and the same procedural rules should be applied. If adequate evidence supports the findings upon which the trial court's ruling is based, we cannot disturb those findings. See White v. United States, 5 Cir., 194 F.2d 215, 217, certiorari denied 343 U.S. 930, 72 S.Ct. 760, 96 L.Ed. 1340.

In its memorandum decision denying defendants' motion, the district court found that defendants had not sustained the burden of proving that a sufficient voluntary disclosure within the purview of the announced policy had been made by them. It found that there had been "no disclosure of an intentional violation or * * * of an intent to defraud the Government" in view of defendants' position, which they maintained at all times, that no tax liability could arise from Shotwell's failure to report black-market receipts, since such receipts and corresponding black-market disbursements by the company "washed-out" each other, and that the disclosure to Sauber was merely an admission of omissions in Shotwell's 1945 and 1946 returns which were based on defendants' alleged good-faith belief that no added tax liability arose from the company's black-market operations.

As bearing on defendants' proof as to their good faith in the so-called disclosure, the court found that such records of the cash transactions in the black-market operations as the corporation had, had been destroyed on instructions of Cain prior to the initial conferences between Shotwell's agents and Sauber; that no bona fide efforts were made by defendants to reconstruct such destroyed records so as to enable the government to determine the amount of tax due, and that figures contained in work sheets turned over to Treasury agents as a part

of the alleged disclosure were admittedly fictitious. The court found further that no promise of immunity had been held out to defendants by any representative of the government at any time, and that nothing was done by any agent of the Bureau to lead defendants to believe that the alleged disclosure was accepted as adequate or that there would be no criminal prosecution on account thereof.

Unless we can say that these findings are so lacking in evidentiary support as to require that they be set aside, we have no choice but to affirm the order denying the motion to suppress evidence. A brief recital of the facts underlying this litigation and a brief summary of the evidence before the court at the proceeding on the suppression motion sufficiently demonstrate, in my opinion, that the findings of the court, were amply supported.

When Busby, and later Cain, first approached Sauber, each reported that, during the taxable years 1945 and 1946, Shotwell had sold large quantities of candy to Lubben, or to Lubben's companies, at a premium price above the established OPA ceiling for the commodity. These shipments were invoiced to the buyer at the established ceiling price, and payments therefor at those prices were recorded on Shotwell's books and duly reported on its tax returns. The buyer was billed separately for the above-ceiling portions of the purchase prices. These payments were received by defendants in cash and were neither recorded on the company's books nor reported for income tax purposes. At the same time, it was reported that the cash thus received was paid out by Shotwell as above-ceiling premium prices for the raw materials which it needed, such as corn syrup and chocolate. On the basis of the representations thus made, Sauber, at that time, expressed his opinion that the facts disclosed strictly a civil matter. The indictments were returned after sev-

---

1. Federal Rules of Criminal Procedure 41 (e), effective October 20, 1949, 18 U.S. C.A. See note to subdivision (e), Notes of Advisory Committee on Rules, 18 U.S. C.A.

eral years of investigation, during which time Shotwell employed Busby, an accountant, to work with the federal agents.

But the above facts tell only a part of the story on which the trial court's findings are based. The evidence adduced at the suppression hearing indicates that Shotwell's black-market operations were more extensive than those first disclosed to Sauber. For example, Sauber was not advised that Shotwell, during the taxable period, made other black-market sales of goods on which no part of the transaction was reflected on the company's books. Allusion has previously been made to other evidentiary facts bearing on the sufficiency of the alleged disclosure, namely, the fact that all records which reflected black-market operations were destroyed by defendants before they approached the Treasury officials and the fact that work papers and supposed summaries of the unreported income turned over to the agents were admittedly fictitious. Furthermore, defendants have maintained at all times that alleged black-market disbursements totalling hundreds of thousands of dollars were paid out by them, without the benefit of any receipts, to faceless men who were unknown to defendants. At all times during the investigation they refused to advise Treasury agents as to who had received these disbursements. They took the position that to whom such payments were made was none of the Bureau's business, while at the same time fictitious figures were inserted in accounting data given to the agents which purportedly reconstructed the financial history of Shotwell's black-market dealings.

The point to be stressed is that on the record before us we cannot say that the evidence does not support the finding of the trial court that no sufficient disclosure was made. We cannot say that the court's conclusion that "False statements and fraudulent representations made to Government agents under the pretense of a voluntary disclosure can never consti-

tute the basis for immunity from criminal prosecution under any possible interpretation of the so-called voluntary disclosure doctrine" is an erroneous legal statement or that the hypothecated facts included in this statement are not descriptive of the proofs made in this case. Two factual questions were presented to the court below, namely, what was disclosed, and, was the disclosure prompted by the taxpayer's reliance on the announced policy or by some other motive best known to him? The trial tribunal has found that, at most, only a partial disclosure was made; that good-faith cooperation with Treasury agents was lacking, and that such lack of good faith disclosed a purpose to mislead the agents. These findings are adequately supported by the evidence. It is not within our province to second-guess the trial court on factual questions.

In my opinion we cannot overturn the court's further finding that no promise of immunity was held out to defendants, or that no other representations were made, which reasonably led them to believe that no criminal prosecution was contemplated. Sauber's opinion, which he expressed during his initial meeting with Cain, that this was strictly a civil matter, was based on the latter's original statement that black-market income not reported for the taxable years was "washed out" by black-market expenditures which was, as the court below found, a partial disclosure only of the true facts of the case. The oral testimony as to statements made at various times by Treasury agents that no prosecution was intended,—that defendants had nothing to worry about,—are disputed by the agents' testimony. Thus this finding is based, in large measure, on the trial court's ruling on the credibility of witnesses.

On the record as a whole, I cannot escape the conviction that the court's interpretation of the voluntary disclosure statements as requiring such a complete disclosure and good-faith effort as to enable the internal revenue agents to assess

the additional tax due is a correct interpretation of the offer held out to taxpayers in the Treasury policy statements. Believing that the court's findings of fact are unassailable, I would affirm the decision denying defendant's motion to suppress the evidence and proceed to consider the merits of the appeal.