The John Harsch Bronze & Foundry Company (Ferro Machine & Foundry, Inc., Successor), et al. [1] v. Commissioner. John Harsch Bronze & Foundry Co. v. Commissioner
Docket Nos. 60703, 63743.
United States Tax Court
T.C. Memo 1958-125; 1958 Tax Ct. Memo LEXIS 100; 17 T.C.M. (CCH) 664; T.C.M. (RIA) 58125; June 30, 1958
*100 Respondent determined that compensation of each of petitioner's two chief executives was excessive in 1951 and 1952 to the extent of $17,500 and $17,980 each. Upon the facts, held, that the entire amount paid to each executive in each year represented a reasonable allowance for compensation for services rendered to petitioner. Robert E. Warren, Jr., Esq., 1002 Citizens Building, Cleveland, Ohio, and Raenelle R. Warren, Esq., for the petitioners. Maurice B. Townsend, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax for the taxable years 1951 and 1952 in the amounts of $28,262.50 and $25,172.50, respectively. He disallowed compensation paid to two of petitioner's executives to the extent of $35,000 for 1951, and $35,960 for 1952. The main question is what amount constitutes a reasonable allowance for compensation of petitioner's two chief executives in the taxable years. There is no issue as to the transferee liability of Ferro Machine & Foundry, Inc. Petitioners have stipulated that if it is determined that the John Harsch Bronze & Foundry Company is liable for *101 any deficiencies for 1951 and 1952, Ferro Machine & Foundry, Inc., is liable for the payment thereof as the transferee of the assets of The John Harsch Bronze & Foundry Company. Findings of Fact The petitioner, The John Harsch Bronze & Foundry Company, was incorporated in 1918 under the laws of Ohio. Its books and records are kept on an accrual basis and on the basis of a calendar year. Its place of business is located in Lakewood, Ohio, a suburb of Cleveland. Petitioner filed its returns for 1951 and 1952 with the collector of internal revenue for the eighteenth district of Ohio. The petitioner's business was started in 1914 by John Harsch and his two sons, Henry B. and Harry J., who operated the business as partners. Four years later petitioner was incorporated. Additional capital was obtained by selling 50 per cent of the stock to outsiders. By 1920, all stock held by outsiders had been acquired by members of the Harsch family, who continued to own all of petitioner's stock until November 3, 1952, when all of the stock was purchased by Ferro Machine & Foundry, Inc., hereinafter called Ferro. Since the '30s, petitioner's business has been that of a jobbing foundry, and it *102 makes, also, ornamental, architectural bronze. A jobbing foundry is one that does special projects. Petitioner was a jobbing foundry of non-ferrous materials such as aluminum, brass, and bronze. It specialized in making heavy castings, some as heavy as 4,000 pounds. These castings were made from both sand molds and permanent molds. Henry B. Harsch was the president and treasurer of petitioner in the taxable years. He was the chief executive; he was in charge of petitioner's financial affairs; and he personally handled the purchase of metals. By the end of 1952, he had had 32 years' experience in the foundry industry. Also, he was in charge of labor relations and sales. Beginning in 1950, petitioner began to make larger castings from permanent molds, and such efforts produced its first successful permanent mold and represented a great step forward in foundry production techniques. The permanent molds were designed by Harry J. Harsch, who was the vice-president and plant manager of petitioner. The companies to which petitioner was furnishing castings wanted a higher production output. Two of petitioner's largest customers were Allis Chalmers and Carrier. The castings prepared for *103 them were for the ultimate use of the Atomic Energy Commission and the castings were part of axial compressors used in compressing uranium hexafluoride to be installed in a plant being erected at Paducah, Kentucky. The petitioner felt that it could develop a permanent mold for larger castings. Up until then, no castings in excess of 600 or 800 pounds had ever been made from a permanent mold. Petitioner approached its customers about developing such a mold. It was finally agreed that the development would be undertaken by the petitioner. If the project failed, the loss would be upon the petitioner, but if successful, the customers would pay for the development cost. The development was successful and the development cost of approximately $90,000 was absorbed by the customers. The development of the permanent mold enabled petitioner to produce castings far superior to those made from sand molds and increased its production six-fold, at the same time reducing its labor costs. For example, with the use of sand molds, petitioner had turned out 4 castings per day; after the development of the permanent mold it turned out 22 castings per day. Since the petitioner was the only foundry *104 that successfully used this technique with large castings, its sales increased tremendously. Its sales in 1950 were practically double those of 1949, and in 1951 and 1952 its sales were double those of 1950. The following schedule shows petitioner's net sales, net income, and surplus for the years 1948 to 1952, inclusive: THE JOHN HARSCH BRONZE & FOUNDRY COMPANY
Income and Surplus Accounts
For the years 1948-1952, inclusive
1948
1949
1950
1951
1952
Sales, net
$1,650,257.74
$1,159,663.69
$2,135,626.27
$4,000,037.33
$4,096,528.29
Cost of goods sold, exclusive
of officers' salaries and de-
preciation
1,463,787.60
1,046,896.97
1,907,724.48
3,590,648.33
3,364,902.83
$ 186,470.14
$ 112,766.72
$ 227,901.79
$ 409,389.00
$ 731,625.46
Selling and administrative ex-
pense: Officers' salaries
55,000.00
55,000.00
55,000.00
95,000.00
95,960.00
Other
106,388.56
89,286.74
142,954.89
175,929.23
201,714.86
$ 161,388.56
$ 144,286.74
$ 197,954.89
$ 270,929.23
$ 297,674.86
Operating income before de-
preciation
25,081.58
(31,520.02)
29,946.90
138,459.77
433,950.60
Other income and (expense),
net
(466.91)
(1,135.60)
578.74
(7,655.89)
(1,110.60)
Net income before deprecia-
tion and Federal income
taxes
$ 24,614.67
$ (32,655.62)
$ 30,525.64
$ 130,803.88
$ 432,840.00
Depreciation
9,149.89
10,133.64
10,721.49
12,505.87
12,892.69
Net income before Federal
income taxes
$ 15,464.78
$ (42,789.26)
$ 19,804.15
$ 118,298.01
$ 419,947.31
Federal income taxes
2,345.25
58,106.29
288,757.10
Net income to surplus
$ 13,119.53
$ (42,789.26)
$ 19,804.15
$ 60,191.72
$ 131,190.21
Surplus, Jan. 1
195,884.98
263,488.82
220,699.56
230,503.71
280,695.43
$ 209,004.51
$ 220,699.56
$ 240,503.71
$ 290,695.43
$ 411,885.64
Reserve for deficiencies, '44
& '45
59,484.31
Dividends paid
(5,000.00)
(10,000.00)
(10,000.00)
Surplus, Dec. 31
$ 263,488.82
$ 220,699.56
$ 230,503.71
$ 280,695.43
$ 411,885.64
*105 High sales continued through 1956 (after petitioner's business was acquired by Ferro). The great increase in petitioner's business was directly attributable to the efforts expended by Henry B. and Harry J. Harsch in 1950, 1951, and 1952. The net sales for the Harsch Division of Ferro from 1953 to 1956 are referred to hereinafter. Prior to May 1951, petitioner paid its sales representatives 5 per cent of its gross sales. Because of the great demand for petitioner's product, it was decided to change the sales commissions, and new agreements were entered into with the sales representatives on or about May 15, 1951. Thereafter, each sales representative was paid 5 per cent on its first $250,000 of gross sales per annum; 4 per cent on the next $250,000; 3 per cent on all over $500,000 but under $750,000; 2 per cent on all over $750,000 but under $1,000,000; and 1 1/2 per cent on all sales over $1,000,000. This meant, for example, that if a sales representative made $1,000,000 in gross sales in a year, his average commission would be around 3 1/2 per cent as opposed to the 5 per cent commission formerly paid. At a joint meeting of the directors and shareholders of petitioner held on *106 December 16, 1950, anticipating increased earnings and to guard against loss of personnel, a profit participation plan was enacted for the benefit of eight top-level, key personnel. The plan provided that the petitioner should set aside in each month a sum not to exceed 20 per cent of the gross profits of the corporation. At the end of the year this sum was divided among the eight key personnel. Henry B. Harsch and Harry J. Harsch were not included in this plan. At the same meeting it was agreed that, in addition to a basic salary of $27,500 each, Henry B. and Harry J. Harsch, each, would be paid 1/2 of 1 per cent of gross sales of the petitioner. Accordingly, in 1951 and 1952, the years in question, this additional compensation was paid. Below is set forth the compensation paid to Henry B. Harsch and Harry J. Harsch from 1942 to 1952, inclusive; included is the compensation paid to their father, John Harsch, from 1942 until his retirement at the end of 1946: THE JOHN HARSCH BRONZE &
FOUNDRY COMPANY
Officers' Salaries
1942-1947, Inclusive
John
H. B.
H. J.
Year
Harsch
Harsch
Harsch
Total
1942
$25,000.00
$35,000.00
$ 6,506.62
$66,506.62
1943
25,000.00
35,000.00
12,956.96
72,956.96
1944
25,000.00
35,000.00
20,000.00
80,000.00
1945
25,000.00
35,000.00
20,000.00
80,000.00
1946
22,916.67
35,000.00
20,000.00
77,916.67
1947
29,375.00
25,625.00
55,000.00
1948
27,500.00
27,500.00
55,000.00
1949
27,500.00
27,500.00
55,000.00
1950
27,500.00
27,500.00
55,500.00
1951
47,500.00
47,500.00
95,000.00
1952
47,980.00
47,980.00
95,960.00
*107 The issued and outstanding capital stock of petitioner consisted of 1,000 shares, and for the years beginning in 1951 until September 20, 1952, the stock was held as follows: Name
No. of Shares
Henry B. Harsch
495.75
Harry J. Harsch
376.75
Raymond Harsch
127.50 From September 20, 1952 to November 3, 1952, when all of the stock was sold, the shares held by Raymond Harsch were held by his widow, Marie Harsch, as executrix of his estate. In 1948, Henry and Harry Harsch considered the possibilities of selling the business, when it was ascertained that Harry Harsch had contracted silicosis. Although they had several offers, none were acceptable to them. In April of 1952, Henry Harsch suffered a coronary thrombosis. In May 1952, they agreed to sell their stock to Ferro Machine & Foundry, Inc., for $600 per share. The transaction was closed on November 3, 1952. Ferro continued to operate petitioner as a subsidiary until October 2, 1953, when the petitioner was liquidated and title to its assets was transferred to Ferro. Thereafter, the petitioner's plant was operated as a division of Ferro. Ferro Machine & Foundry, Inc., concedes transferee liability if the deficiencies, *108 or any part thereof, are sustained. The following sets forth the net sales and net income, or loss, of the petitioner's plant when it was operated as a division of Ferro Machine & Foundry, Inc., for the years 1953 to 1956, inclusive: Net Income
Before Federal
Year
Net Sales
Income Taxes
1953
$4,940,278
$528,186
1954
5,498,790
829,143
1955
3,760,895
153,002
1956
3,098,898
(135,138)
In 1949, when his brother, Harry J. Harsch, felt he could develop a successful permanent mold, Henry B. successfully negotiated with petitioner's customers to underwrite its development. When, as a result of the successful development of the permanent mold, demand for petitioner's product increased, Henry B. Harsch renegotiated all sales agreements which effected substantial reduction of sales costs to petitioner. Harry J. Harsch has been with the petitioner since its organization. During the years in question he supervised the operation of the plant and the engineering and designing of molds. He was manager of the foundry. He was in complete charge of making the castings, as well as the patterns therefor. Harry Harsch designed the permanent mold which resulted *109 in large orders and greatly increased sales. He and his brother, Henry, carried on all the toplevel management of the petitioner. They worked long hours, often as many as 20 hours of overtime in a week. During 1951 and 1952, petitioner had about 260 employees. For the year 1951 petitioner paid Henry B. and Harry J. Harsch $47,500 each. The Commissioner determined that a reasonable allowance for the compensation for each was $30,000, and he disallowed $17,500 each or $35,000. For the year 1952 petitioner paid Henry B. and Harry J. Harsch $47,980 each. The Commissioner determined that a reasonable allowance for the compensation for each was $30,000, and he disallowed $17,980, each, or $35,960. A reasonable allowance for compensation for Henry B. and Harry J. Harsch in 1951 was $47,500 each; and for 1952 it was $47,980 each. Opinion The issue presented is whether the entire amounts of salary paid to Harry J. and Henry B. Harsch, respectively, were "reasonable" within the meaning of section 23(a)(1)(A), Internal Revenue Code of 1939, [2] for 1951 and 1952. The burden of proving reasonableness is upon petitioner. Botany Worsted Mills v. United States, 278 U.S. 282. *110 The question of what constitutes reasonable compensation to an officer of a corporation is essentially a question of fact to be determined by the facts and circumstances of each case. Miller Mfg. Co. v. Commissioner, 149 Fed. (2d) 421. Among the factors to be considered are the type and extent of services rendered by the officer and the volume and special or peculiar characteristics of the petitioner's business. Also to be considered is the prevailing compensation, if known, paid to employees performing similar services in other comparable businesses. Mayson Mfg. Co. v. Commissioner, 178 Fed. (2d) 115. Where those whose compensation is at issue for tax purposes own the controlling stock of the employer-corporation, it is necessary to examine *111 the facts carefully in order to determine whether dividends are in fact being distributed under the guise of compensation for services. Long Island Drug Co., 35 B.T.A. 328, affd. 111 Fed. (2d) 593. Upon consideration of all of the evidence, it is concluded that the entire amount paid by petitioner in the taxable years to its two chief executives constituted a reasonable allowance to each as compensation for services rendered to petitioner in the taxable years, and that respondent erred in disallowing deduction of part of such amount, with respect to each executive. Testimony of witnesses who are executives of corporations carrying on businesses similar to petitioner's business, who were well acquainted with petitioner's operations as well as the services performed by the two executives here involved, establishes that the total sum paid to each was comparable to compensation paid to the chief executives of like corporations. Indialantic, Inc. v. Commissioner, 216 Fed. (2d) 203; California Vegetable Concentrates, Inc., 10 T.C. 1158. At a joint meeting of petitioner's directors and stockholders in December 1950, it was decided *112 to set aside 20 per cent of net profit to be distributed to eight key personnel, not including the two chief executives. At the same meeting the two executives were voted compensation of 1/2 of 1 per cent of gross sales, over and above a basic salary of $27,500. This action, in view of anticipated increase of business calling for increased effort and greater responsibility, does not appear to us to have constituted a scheme for the distribution of earnings. An arrangement to pay a percentage of earnings before they are earned has been held to be consistent with sound business principles. William S. Gray & Co. v. United States, 35 Fed. (2d) 968; J. D. Van Hooser & Co. v. Glenn, 50 Fed. Supp. 279. The record shows that the two chief executives exercised superior managerial ability; that because of their efforts, petitioner was able to operate with few assistants to the chief executives; and that petitioner's earnings in the taxable years were very largely the result of the efforts of the two executives. Beginning in 1951, petitioner's volume of the business doubled over the previous year, and in 1952, it again doubled. It is recognized that if the increase *113 in volume was due to economic conditions beyond the control of the executives and of petitioner, it would not justify the large increase in compensation for those years. The respondent contends that the large increase in sales for the years in question was directly attributable to the Korean War rather than to the efforts of the petitioner's two officers. But the record does not support this contention. Even if part of the increased business was due to war orders, it meant increased work and new problems for the two executives for which they were entitled to increased compensation. Roth Office Equipment Co. v. Gallagher, 172 Fed. (2d) 452; Glenshaw Glass Co., 13 T.C. 296; R. P. Farnsworth & Co. v. Commissioner, 203 Fed. (2d) 490. However, the large increase in the volume of sales was due primarily to contracts with Allis Chalmers and Carrier who, in turn, had the work subcontracted to them by Union Carbide. The material manufactured by petitioner for these customers consisted of aluminum castings which were used as a part of an axial compressor used to compress uranium hexafluoride. This material was furnished to the Atomic Energy Commission *114 to be installed in a plant at Paducah, Kentucky. There is nothing in the record to show that this project was in any way connected with the Korean War effort. The petitioner, according to testimony of witnesses engaged in the non-ferrous foundry industry, secured the orders from Allis Chalmers and Carrier because it was able to furnish a superior casting on a high production level. The castings were of an unusually large size. Prior to 1951, castings of this size were made from sand molds. That process was slow and produced an inferior casting. Harry J. Harsch began, in 1949, to develop a permanent type mold. He was successful in this undertaking in 1950, and thereafter petitioner was able to supply to customers the castings needed at a greatly increased production rate. Considering all of the evidence, our conclusion is that the entire amount of the compensation paid to Henry B. and Harry J. Harsch, each, was reasonable. Their joint efforts created a product which gave petitioner a considerable advantage over its competitors, and enabled petitioner to do what no other non-ferrous foundry had been able to do. In 1948, petitioner paid a dividend of $5,000 out of income after taxes *115 of $13,100. The petitioner had a loss in 1949. In 1950, petitioner paid a dividend of $10,000 out of income after taxes of $19,800. In 1951, petitioner declared a dividend of $10,000 out of income after taxes of $60,100. The petitioner's stock was sold to Ferro before the end of 1952. The respondent does not make any contention that the petitioner had an unreasonable accumulation of earnings. It is evident, therefore, that petitioner did not fail to distribute dividends. In view of our holding under this issue, it is unnecessary to consider other contentions of the petitioner. Because of minor adjustments which are not contested, a Rule 50 computation is necessary. Decisions will be entered under Rule 50. Footnotes
1. Consolidated herewith is Ferro Machine & Foundry, Inc., transferee, Docket No. 63743.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩