Plimpton Tool Company, Inc. v. Commissioner.
Plimpton Tool Co. v. Commissioner
Docket No. 2257-70.
United States Tax Court
T.C. Memo 1972-134; 1972 Tax Ct. Memo LEXIS 124; 31 T.C.M. (CCH) 612; T.C.M. (RIA) 72134; June 22, 1972
C. John Parker, for the petitioner. Edward De Franceschi and Alan I. Weinberg, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal corporate income tax returns for 1966 and 1967 in *125 the amounts of $19,135.28 and $21,556.09, respectively. Concessions having been made by the parties, the issues for determination are: (1) Whether certain funds carried on petitioner's books as "Commissions and Other Income" and reported on petitioner's corporate income tax returns as "Gross Sales" were part of petitioner's gross income or were, in fact, commissions earned by and belonging personally to Frank H. Plimpton; and (2) Whether the total compensation paid by the petitioner to its president, Frank H. Plimpton, was reasonable within the meaning of section 162. [1]
Findings of Fact Plimpton Tool Company, Inc. (hereinafter referred to as petitioner), a corporation organized under the laws of the State of Vermont, had its principal place of business in Springfield, Vermont, at the time its petition was filed. It filed its corporate income tax returns for 1966 and 1967 with the district director of internal revenue, Burlington, Vermont. In about 1955, Frank H. Plimpton (hereinafter Plimpton) entered into the business of selling and distributing *126 industrial metalworking tools, such as diamond wheels, industrial diamonds, milling cutters, collapsible taps, and twist drills. Until 1961, he operated the business as a sole proprietorship, using the trade name of Plimpton Tool Company. Plimpton's business involved two different endeavors. One consisted of the buying of tools from manufacturers, inventorying them, and reselling them to customers. The profit realized from this activity was derived from the spread between the purchase price and the sales price of the various articles. The other aspect of the business consisted of a sales agency arrangement whereby customers ordered tools from certain manufacturers through Plimpton. Each order went directly to the manufacturer, which made the tool, shipped and invoiced it to the customer, and paid Plimpton a commission for his sales work. The sales agency aspect of Plimpton's business was conducted pursuant to various contracts entered into by him and the manufacturers. Between about 1955 and 1960, Plimpton personally entered into agreements with The Van Keuren Co., New England Carbide Tool Co., Inc., Lovejoy Tool Company, Inc., Parsons Diamond Products, Inc., and Muskegon Tool *127 Industries, Inc. The agreements provided that Plimpton was to be the sales representative in the New Hampshire-Vermont area, and was to receive commissions ranging from 10 percent to 15 percent of his sales. During these early years of his business, Plimpton had only one checking account. It was a personal account maintained in the names of himself and his wife. All moneys received from the business - whether due to the sale of inventoried items or the commissions Plimpton earned under his sales agency agreements - were deposited in this checking account. In 1961, Plimpton established the petitioner-corporation. He and his wife were the sole shareholders, and he served as its president. After the incorporation, the business as a whole remained essentially a twofold operation: Petitioner, the corporation, continued the endeavor which involved the purchase, inventory, and sale of tools obtained from manufacturers at a discount, and Plimpton, as an individual, continued to make sales as the agent of the various manufacturers with which he held sales agency agreements. None of the sales agency agreements were ever assigned to petitioner. All moneys from both aspects of the business *128 were deposited in petitioner's bank account and recorded in its books. Plimpton ordered this to be done solely for bookkeeping purposes so that all data regarding 614 the income from both sources would be available to the auditors, accountants, and bookkeepers. Plimpton had responsibility for generating all of petitioner's sales of tools. During the years in issue, petitioner had no salesmen other than Plimpton. In addition to his sales duties, Plimpton did all the purchasing, handled all orders, and administered the general office functions. During the years in issue, he spent much of his time on the road as the salesman, often leaving home before 8 a.m. and returning after 6 p.m. When he was not traveling, he worked in the office. Petitioner maintained two separate accounts on its books to reflect the income realized from the sale of inventoried tools and the commissions received from Plimpton's activities as sales agent for the various manufacturers. The former income was reflected in an account denoted "Sales" and the latter in an account labeled "Commissions and Other Income" (hereinafter referred to as "Commissions"). Petitioner's books show the following receipts in *129 the "Commissions" account and the "Sales" account for the taxable years indicated: Commissions
Sales
Year
Account
Account
1964
$18,142.46
$443,716.76
1965
21,356.54
610,934.48
1966
34,012.49
830,350.51
1967
32,485.54
790,847.75
Petitioner, in its corporate income tax returns, reported the following gross receipts, net income before taxes, taxable income, and dividends paid for the taxable years indicated: Year
Gross Sales [1]
Net Income [2]
Taxable Income
Dividends
1964
$461,859.22
$22,181.61
$21,569.61
$ 2,040.50
1965
632,291.02
23,714.69
24,295.20
2,040.50
1966
864,363.00
26,937.42
26,373.36
4,372.50
1967
823,333.29
20,727.02
20,727.02
4,372.50
The balance sheets of petitioner, attached to its 1966 and 1967 corporate income tax returns, show that for 1966 it had capital stock at the beginning of the year of $14,575, and *130 $43,725 at the end of the year; and for 1967, it had $43,725 of capital stock at the beginning and the end of the year. In its corporate income tax returns for 1966 and 1967, the amounts paid Plimpton as salary and the commissions earned under his sales agency agreement were lumped together and deducted as compensation. The following figures represent the total compensation claimed as deductions in petitioner's returns: Nondeferred
Deferred
Year
Compensation
Compensation
1966
$70,014.35
$10,507.35
1967
76,510.88
11,476.63 The "Nondeferred Compensation" figure is the combined amount of the salary and the commissions. Respondent, in his notice of deficiency, disallowed deductions for compensation to Plimpton claimed by petitioner as follows: Nondeferred
Deferred
Year
Compensation
Compensation
1966
$29,781.32
$ 4,472.40
1967
37,586.38
5,637.05 With respect to the "Nondeferred Compensation," respondent determined that it "[exceeded] a reasonable allowance for salaries or other compensation for personal services actually rendered within the ambit of section 162." The disallowance of a portion of the "Deferred Compensation, *131 " in accordance with section 404(a)(3)(A), reflected the adjustments made to Plimpton's salary. Ultimate Findings of Fact (1) The "Gross Sales" reported by petitioner in its corporate income tax returns for 1966 and 1967 improperly included commissions earned personally by Plimpton, and the amount reported by petitioner as "Nondeferred Compensation" to Plimpton and claimed as deductions by petitioner in its tax returns incorrectly included these commissions. 615 (2) The total compensation petitioner paid Plimpton during the years in issue was reasonable in amount. Opinion Petitioner, in defense of the reasonableness of the compensation paid to Plimpton, argues that the amounts reported as gross sales and as compensation to Plimpton included the commissions which he earned under his various sales agency agreements and that these commissions never really belonged to the corporation. Thus, before we can determine the reasonableness of the compensation which petitioner paid to Plimpton, we must decide whether the amounts shown in the "Commissions" account were actually income of petitioner or were the individual income of Plimpton, funneled through petitioner's books. *132 Respondent, in refutation of petitioner's argument, contends that petitioner's manner of reporting the commissions as a portion of "Gross Sales" and the inclusion of them in petitioner's compensation is controlling, and that petitioner cannot now argue that it was solely a conduit. In support of this contention, respondent argues that the sales agency contracts between Plimpton and the manufacturers were not personal and could have been assigned, and that petitioner, in all respects, treated the commission sums as compensation payments. It is true that petitioner reported the commissions in its gross sales and included them in the amount of compensation shown as paid to Plimpton, but these factors alone are not controlling. While they may be construed as an admission against interest in respect of the issue here presented, they do not estop petitioner from showng the true facts, and resolution of the ownership of the funds in question depends upon all the facts rather than upon bookkeeping entries. We think petitioner has carried its burden of showing that the commission income was not its income but rather belonged to Plimpton. The evidence showns that from the beginning of Plimpton's *133 business in 1955, he had two sources of income: One was the money earned on the purchase, inventory, and sale of tools; and the other was the commissions earned as the sales agent of various manufacturers. The commission income was dependent upon the sales under the agency agreements which Plimpton had with the various manufacturers and did not depend at all upon the sales of tools from inventory. When petitioner was formed in 1961, the dual nature of the business continued. Plimpton perhaps could have assigned the agreements to petitioner when it was organized, but the undisputed, credible testimony is that he did not do so. The only substantial evidence supporting respondent's position on this point is the manner in which the books were kept and the income tax returns were prepared. Plimpton explained that the commission income was recorded on petitioner's books "solely for bookkeeping purposes" so that complete information would be "available to the auditor, to the bookkeeper, and to the accountant, and to keep them where everybody knew it." From the standpoint of petitioner, the item was "a wash": i.e., although the commissions were taken into income, they were offset by the *134 payment thereof to Plimpton. The income tax returns reflected these bookkeeping entries. In light of all the evidence, we believe that petitioner served as a mere conduit for Plimpton's commission income from the sales under the sales agency contracts. Our Findings reflect this conclusion. [2]
We must now turn to a consideration of whether the total compensation actually paid to Plimpton by petitioner in 1966 and 1967 - disregarding the commissions earned pursuant to the sales agency agreements - was reasonable within the meaning of section 162. Section 162(a)(1) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," including "a reasonable *135 allowance for salaries or other compensation for personal services actually rendered." The regulations (sec. 1.162-7(a), Income Tax Regs.) provide that the "test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." The question of what is reasonable compensation cannot be answered without a close study of all the facts and circumstances 616 of the particular case. Botany Worsted Mills v. United States, 278 U.S. 282 (1929); Dahlem Foundation, Inc., 54 T.C. 1566, 1579 (1970). The prior decisions concerning this issue lay down no hard and fast rules as to reasonableness. Among the factors which must be given consideration are the work performed by the employee, the time and energy devoted to the work, and the results that have been accomplished. With these factors in mind, we have examined all the evidence and believe the total compensation paid by petitioner to Plimpton is reasonable. The evidence shows that Plimpton was the president and chief executive officer of the corporation. He was also responsible for all the sales of tools by petitioner. Since petitioner's income *136 was derived exclusively from these sales, Plimpton was directly responsible for its volume of business. Through the years he had developed personal relationships with numerous customers which were highly valuable to petitioner, and much of its business came from these customers. In addition, Plimpton devoted much time to purchasing products from the manufacturers, handling all orders, and administering the general office functions. The record shows that petitioner's business has grown steadily under Plimpton's management, ranging from about $296,000 in 1961 to $830,000 in 1966. Petitioner has paid a dividend each year, and the amounts thereof in 1966 and 1967 were more than twice the amounts paid in the two immediately preceding years. In a competitive business which generated gross sales of approximately $830,000 in 1966 and $790,000 in 1967, we do not think it was unreasonable to pay Plimpton, the chief executive officer, the only salesman, and the main catalyst for all business, total compensation of approximately $40,000 in 1966 and approximately $50,000 in 1967. In light of all the evidence, we find that petitioner's total compensation to Plimpton during the years in issue *137 was reasonable. To reflect our Findings and the concessions made by the parties, Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.↩
1. The gross sales were computed by adding together the amounts shown in the "Commissions" account and the "Sales" account. The effect of our decision is to reduce petitioner's reported "Gross Sales" by the amount found in the account labeled "Commissions and Other Income," and to reduce the amount of "Nondeferred Compensation" claimed to have been paid to Plimpton by petitioner by an equal amount. Adjustments to the "Deferred Compensation" in accordance with sec. 404(a) (3)(A) and any other alterations necessitated by our Findings will be covered by the Rule 50 computation.
[2]↩ In computing these amounts of net income, the sums paid to Plimpton as compensation, including the sales agency commissions, were deducted.